Civil action to recover on policy of insurance benefits for total and permanent disability and for waived premiums paid.
The "total and permanent disability provisions" of the policy of insurance issued to plaintiff by defendant on 11 February, 1931, upon which claim was filed by plaintiff in August, 1940, and upon which this action is based, are these: "Upon receipt of proof satisfactory to the company at its Home Office that while the said policy was in full force and effect, before default in the payment of premiums and before the anniversary of said policy on which the age of the insured at nearest birthday is sixty years, the insured has become totally disabled as defined below and will be continuously so totally disabled for life, or if the proof submitted is not conclusive as to the permanency of such disability but establishes that the insured is, and for a period of not less than four consecutive months immediately preceding receipt of proof has been, totally disabled as defined below, the company will (1) waive the payment of any premium falling due under said policy during such disability . . . and (2) pay to the insured . . . a monthly income of one hundred and 00/100 Dollars. . . . Disability shall be considered total *Page 717 
whenever the insured becomes disabled by bodily injury or disease so that he is wholly prevented thereby from engaging in any occupation and performing any work for compensation or profit . . . The disability benefit herein provided shall not be payable if disability shall have resulted . . . from bodily injuries self inflicted."
For cause of action, in this connection, plaintiff in his complaint alleges "that for many years plaintiff has been suffering from a nervous and mental trouble, also from ulcerated stomach and other diseases of the body and said suffering and diseases have so affected the physical condition of this plaintiff that he has been unable since the early fall of 1938 to do any work and same has prevented him from engaging in any occupation for remuneration or profit," which "condition has grown worse from time to time and since the fall of 1938 he has not been able and has not done any work whatsoever for remuneration or profit and has been totally and permanently disabled."
In answer thereto defendant denies this allegation, and (1) avers that plaintiff is not totally and permanently disabled as defined in the disability provision contained in the policy upon which he sues; and (2) that even though plaintiff be totally and permanently disabled, his condition has been caused and brought about by a voluntary, excessive and continuous use of alcohol and drugs, and is not covered by the wording and intendment of the policy.
Evidence for plaintiff is substantially as follows: Plaintiff, 40 years of age, has been licensed to practice law and practiced in Williamston, North Carolina, until the latter part of the year 1939, when he closed his office. He "has been a nervous man" for many years. Though "he drank a little before his father's death" in 1938, afterwards he was known to drink whiskey to excess, and "when he was drinking bad, he drank two or three pints a day, or during the night and day." After the death of his father, his mother states, "he would take too much whiskey and I sent him to Westbrook at Richmond four different times." He remained at Westbrook for a total of seventy-eight days during the period beginning 17 February, 1939, and ending 26 June, 1942. He also "went to Pine Bluff once" and "to Raleigh three times," "not entirely for drinking," but "to get his nerves straight." "Once or twice he wasn't drinking at all." His mother testified: "He is what I call a nervous wreck. He is just so nervous at times he is like a worm in the fire; he can't be still anywhere. It has been coming on him gradually for seven or eight years." She also says: "There were periods of time in the last two or three years that he did not drink any whiskey. Sometimes he would go all to pieces so bad he felt like he had to have something. He would be so nervous that he couldn't be still and had to take a drink of whiskey to try to quiet himself, and at times that would sort of quiet his *Page 718 
nerves. Of course the after-effect would be worse than before he started. . . . When he went to Westbrook first it was in February, 1939. When he came back he was sober for a while, didn't drink any whiskey. During this time he was very nervous and could not sleep. . . . He came back in the middle of the summer the last time and since that time has been a sober man. . . . He is at home. He came down here and saw Dr. Darden this morning and he went to pieces so bad we thought it best for him to go back home. . . . He was sober." She further testified that plaintiff also "went to Johns Hopkins Hospital for treatment for his stomach — complained of his stomach, and that for the last two or three years he has been troubled with hemorrhoids" . . . and that "he has also had trouble with his teeth." His wife testified: "On August, 1940 (that is the date when plaintiff filed claim for disability benefits), and the year prior to that time, he was just as nervous to me as anybody could be. . . . He has been a nervous man all the years I have known him, but he has grown worse . . . as far as his nerves are concerned."
Dr. O. B. Darden, a medical expert and psychiatrist connected with Westbrook Sanatorium at Richmond, Virginia, as witness for plaintiff, testified: "J. W. Bailey, plaintiff, was admitted to our institution four times. The first time was February 17, 1939, and he remained under treatment until March 16, 1939. I examined him and I saw him virtually every day. The next time he entered the institution was September 27, 1941, and he remained until October 24, 1941. I again examined him both physically and mentally and he was under my observation and treatment each day. He again entered the institution on October 28, 1941, and left November 3, 1941. I again diagnosed his case and saw him every day while he was there. He was admitted again on June 11, 1942, and stayed until June 26, 1942. I again examined him and gave him treatment each day that he remained." Then, under cross-examination as to the above, the doctor testified: "I first saw Bailey in February, 1939. He came to our institution. I think I admitted him. He had been drinking. He said he did not come to get off drinking. The purpose of his being in our institution was, I think, to be treated for what was wrong with him. He was drinking, but that was not the fundamental thing. I have no idea as to the extent of his drinking. The first time, according to the informant, he had been drinking excessively. He had stepped it up at night from one-half pint to a pint and quart during the day. The second time he came to our institution he was not drinking when he was admitted. The third time he left us against our advice on the 24th and came back the 28th. He went to town and began drinking. The second time he stayed from September 27th till October 21st, and he left against our advice and went up town and got drunk and he came back and stayed until October 28th. The third time he went on June 11th *Page 719 
and left on June 26th. He was drinking then. Our treatment was directed towards getting him to understand his condition, so that he could make a better adjustment in the community. After three days we withdrew whiskey. This is general treatment we give. We did not treat him for inebriacy." Again reverting to testimony of the doctor on direct examination — "From my various examinations and observations of him on these various visits I thought he was mentally sick. This conclusion was reached from the symptoms that I observed and the history of him that we received and the results of our examination. As to his physical status, we found nothing significant from the standpoint of his present condition. We found some pyorrhea and dental infection and bad teeth, and he was underweight. We found no external nor internal hemorrhoids. He was very nervous and very restless . . . physically and mentally. . . . He had to be doing something all the time, walking around, up and down, and in his talks he was continuously trying to make himself impressive, though what he was saying had no meaning in so far as we were concerned in the application of what we felt about his own situation. In so far as he was concerned there was no reason for his being there; he didn't need treatment and there was nothing wrong with him. There was something in his situation, meaning his situation at home and in his business, that made it impossible for him to get down to work and stick to it, which he explained as being some outside influence that kept him from his business and from him taking his rightful place in the group at home, and for that reason he wanted to go home, thought it mandatory that he do, his business needed him, and characteristically of such people, he would write us a letter to impress that upon us, but he did complain of being restless, nervous, and did not sleep well. At times he would break down and cry without any reason, showing a very definite emotional instability. There was no evidence that his judgment was at all good. We thought it was definitely impaired because of his sickness. . . . We went into his condition as thoroughly as we could and from the standpoint of a laboratory there was nothing organically wrong. He had been drinking some, and, as most people who drink, showed some . . . in his urine. It cleared up, and examination of the blood showed that there was no damage . . . because of damaged kidneys, so both urine examination and the blood examination showed that the kidneys were not damaged. There was no evidence of any liver damage, and there was no evidence of any damage to the central nervous system, that is, the brain and the nerves, from any injurious substances. The heart and vessels were normal. There was, as I said, some trouble with his teeth, which we thought was insignificant." And in answer to question as to what led him to believe that Bailey was a sick man, both physically and mentally, the doctor said: "His impaired judgment, his lack of *Page 720 
reasoning, lack of consideration of other people, his absolute lack of understanding of his own condition and situation, and he had no appreciation of what he should do, his proper place in society. There was no apology because he was not working; so far as he was concerned he was satisfied with the position he was having at that particular time, demanding of others, but wholly inattentive to his responsibilities and obligations. . . . I think he is weak in the ordinary meaning of the word in that he has not kept himself in good shape, but his organs are in good condition. . . . In so far as his condition has been since I have known him up to this time, I think there is no question that he has been totally disabled to do any sustained work or put forth any sustained effort over sufficient time to be self supporting, and I can only express an opinion, of course, as to the future, and based upon what I have found in him, my feeling is that his condition is permanent unless something is done to help him, and I have no assurance that it would be materially improved with all the help anybody could give him. I think there has been a progressive instability and a progressive change in his makeup, in his reactions, and in his feelings, progressive towards the worse. In other words, I think he was in worse condition the last time he was in our institution than the first. In regard to the allegation that his trouble is self inflicted and liquor being the primary cause of his condition, there is no evidence to show anything poisonous has damaged any tissues. I mean the kidneys, the liver, and the brain. I would say that my examination and conclusion that liquor is not the primary cause of his condition." And in this connection, under cross-examination, Dr. Darden continued: "I do not think whiskey drinking is a disease and I do not think it, per se, can be treated. The underlying situation can be treated I do not think anybody drinks whiskey just to drink it. Some disease causes all whiskey drinking, all that I have ever seen. I have never seen it when it was not secondary to something else. . . . Nobody drinks whiskey that is not diseased and the disease is causing the drinking. We never treat drinking at Westbrook per se. We try to treat some thing else. . . . I think whiskey drinking is a symptom just as fever is a symptom of pneumonia. Whether it is excessive drinking or just ordinary drinking like everybody does is a big question, but I think that everybody who drinks whiskey, even the so-called social drink, is to change their prospective. I think that if he did not want to change his attitude at the particular moment, he would not take a drink. I think this situation is a dissension with a particular situation. I do not call it a disease. It may be momentary or transient. . . . As to how we treated Judge Bailey from June 11th to June 26th, all of our thoughts about his condition have been the same when we got him away from whiskey, and so what we thought the fundamental condition was and we *Page 721 
have thought and told him that, and we have told members of his family and we have told his referring physician that we did not think he was well when he stayed there the first time, though he was off whiskey and had been for three weeks. . . . I think those who drink whiskey are very unsatisfactory patients because we often have the same trouble with them that we had with Judge Bailey and we cannot get them to understand their situation and very often no co-operation from the family is given. Drinkers of whiskey, if they do not understand their situation, give us more trouble, though not all of them. . . . Judge Bailey never got out of Richmond one time before he went to the hotel and began drinking." And, Dr. Darden, on re-direct examination, concluded by saying: "The fundamental trouble of Judge Bailey is not liquor, absolutely not. That is my opinion. It is the disease of the mind and body that finally brought about the drinking."
Dr. J. E. Ward, as witness for defendants, testified: "I have known J. W. Bailey for twenty years. I have treated him when he was drinking and I couldn't say when he started drinking. The first I knew about it was some time after his father's death, maybe a year or two. He drank pretty severely. He was a heavy drinker. I should say that I knew his condition at the time I treated him. He was a nervous temperament and had some trouble with his stomach, but I didn't find any serious illness that I knew of. I examined him several times and he seemed all right. He has always been nervous since I have known him. I think without whiskey he would be able to have carried on all right. He had been doing all right for years and if there was any sudden change in his makeup I didn't discover it. He was nervous and had some trouble with his stomach. He had been to Baltimore and had some X-ray pictures made. As to his stomach, I do not know of anything definite. No definite diagnosis was made. I think he would have been able to attend to his business affairs if he had left whiskey alone." On cross-examination: "He was also suffering from hemorrhoids. They gave him trouble at times and at times didn't. I have not treated him for several months." Then on re-direct examination, the doctor said: "I believe his not being able to work was caused by drinking. I think he is what we would term an inebriate. He is weak. He does not have any will power. Maybe he wants to quit but he does not. I think if he would co-operate and get the right attitude he could quit. He seems to have the idea that he does not have any resistance. He has been very nervous and can't sleep . . ."
C. B. Roebuck, sheriff of Martin County, as witness for defendant, testified: "I know J. W. Bailey. He has been drinking right much for the last three or four years. I have had occasion to be called to his home several times. I carried him off once or twice. I carried him to *Page 722 
Westbrook one time, Pine Bluff one time, and to Raleigh two or three times. I carried him for the treatment of drinking. . . . I carried him to Raleigh and he lacked just a little of drinking two pints from here to Raleigh. It took me about three hours to go. I saw him take one-half pint at one time on my way to Raleigh." On cross-examination the sheriff said: "I don't know anything at all about Walter's physical condition. I have known him since 1913. He was extremely nervous. . . . I carried him to Westbrook as the commitment directed."
There was other evidence bearing upon the question of plaintiff's disability to engage in any occupation and to perform any work for compensation or profit.
The court overruled motion of defendant for judgment as of nonsuit at close of evidence for plaintiff, to which defendant excepted, but such motion at close of all the evidence was allowed.
Plaintiff excepted and appeals to Supreme Court and assigns error.
If it be conceded that there is evidence tending to show, or from which it may be inferred, that plaintiff is totally disabled, is there evidence that he became so "by bodily injury or disease" within the meaning of the policy of insurance? Careful consideration of the evidence taken in the light most favorable to plaintiff, as we must do in passing upon the correctness of judgment as in case of nonsuit, dictates a negative answer.
"An insurance policy is only a contract, and is interpreted by the rules of interpretation applicable to other written contracts, and the intention of the parties is the object to be attained," Varser, J., in McCain v. Ins.Co., 190 N.C. 549, 130 S.E. 186, applied in Stanback v. Ins. Co.,220 N.C. 494, 17 S.E.2d 666. See also Crowell v. Ins. Co., 169 N.C. 35,85 S.E. 37; Powers v. Ins. Co., 186 N.C. 336, 119 S.E. 481;Bolich v. Ins. Co., 205 N.C. 43, 169 S.E. 826. In the Powers case,supra, Adams, J., speaking for the Court, said: "But the rule is equally well settled that contracts of insurance, like other contracts, are to be construed according to the sense and meaning of the terms which the parties have used; and if they are clear and unambiguous their terms are to be taken and understood in their plain, ordinary and popular sense." See alsoBray v. Ins. Co., 139 N.C. 390, 51 S.E. 922.
And in the Bolich case, supra, Connor, J., speaking of the meaning to be given the word "explosion," there under consideration, expressed the *Page 723 
rule in this manner: "The word as used in the policy of insurance should be construed in its popular sense, as used by ordinary men, and not in the scientific sense as used by scientific men." "We can only construe the contract as the parties have made it," Devin, J., in Sanderlin v. Ins. Co.,214 N.C. 362, 199 S.E. 275, and cases cited.
The language of the policy under consideration clearly states that "disability shall be considered total whenever the insured becomes disabled by bodily injury or disease so that he is wholly prevented thereby from engaging in any occupation or performing any work for compensation or profit." It is not contended that plaintiff is disabled by reason of bodily injury. Therefore, is his disability the result of "disease"? "Disease" has been defined as "an alteration in the state of the human body . . . or of some of its organs or parts interrupting or disturbing the performance of the vital functions, or of a particular instance or case of this"; as "deviation from the healthy or normal condition of any of the functions or tissues of the body"; and as a "morbid condition of the body." Black's Law Dictionary, 3rd Edition, 18 C. J., 1139. See also McGregor v. AssuranceCorp., 214 N.C. 201, 198 S.E. 641, where it is said that these definitions have been adopted in one form or the other in decisions of numerous courts, citing cases.
When, under the above rule of construction, these definitions are applied to the facts of the case in hand, the evidence fails to show that plaintiff's disability is the result of disease, as the term is understood in its plain, ordinary and popular sense. While there is evidence that plaintiff has for many years been highly nervous and has drunk whiskey to excess, for which he has taken treatment at several places, the evidence shows there is nothing organically wrong with him. The testimony of his witness, Dr. Darden, who examined him and had him under observation almost every day for seventy-eight days, during the period from February, 1939, to June, 1942, is that "the kidneys were not damaged"; that "there was no evidence of any liver damage"; that "there was no evidence of any damage to the central nervous system, that is, the brain and the nerves, from any injurious substances"; that the "heart and vessels were normal"; that though there was some trouble with his teeth it was thought to be insignificant; and that "no external or internal hemorrhoids" were found. The doctor, theorizing that whiskey drinking is not a disease but a symptom — that some disease causes all whiskey drinking, gives as his opinion that plaintiff's "fundamental trouble is not liquor" but that "it is the disease of the mind and body that finally brought the drinking." Yet the doctor fails to state what is the fundamental trouble. And on being asked "What led you to believe that he was a sick man, both physically and mentally?" the doctor answered: *Page 724 
"His impaired judgment, his lack of reasoning, lack of consideration of other people, his absolute lack of understanding of his own condition and situation, and he had no appreciation of what he should do, his proper place in society. There was no apology because he was not working; so far as he was concerned he was satisfied with the position he was having at that particular time, demanding of others, but wholly inattentive to his responsibilities and obligations."
On the other hand, Dr. Ward, witness for defendant, who has known plaintiff for twenty years, who has been the family physician, and who has treated plaintiff when he was drinking, says that he "didn't find any serious illness," and that in his opinion plaintiff "is what we would term an inebriate." And there is no contention on this record that inebriacy or drunkenness is a disease. In fact, plaintiff's evidence tends to show that, from a scientific point of view, whiskey drinking is not a disease but a symptom of some disease which causes whiskey drinking and fails to show a "disease" in the plain, ordinary and popular sense of the word.
The judgment below is
Affirmed.