SECURITY NATIONAL BANK OF DURAND, Plaintiff-Appellee,

v.

FIDELITY AND CASUALTY COMPANY OF NEW YORK, Defendant-Appellant.

No. 11948.

United States Court of Appeals Seventh Circuit.

July 8, 1957.

George Y. King, Ramsdell, King, Carroll & Barland, Eau Claire, Wis., for defendant-appellant.

Harold E. Stafford, Chippewa Falls, Wis., for appellee.

Before MAJOR, LINDLEY and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

The plaintiff bank brought this action against the defendant insurance company seeking to recover pursuant to the provisions of a bankers blanket indemnity bond for a loss sustained by reason of a fraud committed on the bank by one of its customers.

The cause was submitted to the District Court on an agreed statement of facts and the plaintiff prevailed. 145 F.Supp. 667. The facts, as stipulated by the parties, are as follows:

"The plaintiff is a national banking corporation, with its banking house in the City of Durand, Pepin County, Wisconsin.

"The defendant is a New York insurance corporation.

"That on or about the 17th day of November, 1951 the defendant issued to the plaintiff its bankers blanket bond * * *. Clause (E) of the bond is relied upon by plaintiff as the basis of this action.

"That thereafter the bank had engaged in the business of loaning money to Chain-O-Lakes, Inc., a corporation, with its principal place of business at Waupaca, Wisconsin. Chain-O-Lakes, Inc. was engaged in the business of buying and selling cheese, eggs and other merchandise. Its president and managing agent was Irving G. Koren of Waupaca, Wisconsin. There were a number of cheese factories in Wisconsin which sold their entire output to Chain-O-Lakes, Inc. Chain-O-Lakes, Inc. then in turn sold the cheese to National Tea Company, Armour & Company, Swift and Company, and a number of other nationally known dealers. The sale of the cheese and eggs to a purchaser was evidenced by the usual invoice describing the goods shipped and sent to the customer. In order to finance the business a duplicate of the invoice was taken to the Security National Bank of Durand and an assignment to the bank was stamped thereon and signed by Irving Koren for the Chain-O-Lakes, Inc. The bank then advanced 80% of the face of the invoice to the Chain-O-Lakes, Inc. When the purchaser of the merchandise paid the amount of the invoice the proceeds were paid to the Security National Bank. This gave the Chain-O-Lakes, Inc. operating funds with which to continue buying merchandise and selling merchandise to its customers. * * *

"On or about November 10, 1954, Irving Koren of the Chain-O-Lakes,

Inc. presented to the Security National Bank a number of invoices with the assignments endorsed thereon to the Security National Bank. The Security National Bank in good faith and in the course of business thereupon released the funds to the Chain-O-Lakes, Inc. as had been the practice on previous occasions. Shortly thereafter Chain-O-Lakes, Inc. became financially involved and ceased doing business. Some of the purchasers of the merchandise upon being notified by the bank to pay their indebtedness to the bank, denied having received or ordered any such merchandise. Upon investigation it was found that these invoices which had been assigned to the Security National Bank in fact did not represent merchandise sold, as no shipments of cheese or eggs had been made and no original invoices had been sent to the alleged consignees. The invoices purported to represent shipments of merchandise and obligations of the purchasers, but in fact did not represent any shipments or indebtedness. The only signature on the assignments is that of Irving Koren and the only documents signed by him are the assignments on the invoices attached hereto. It is his genuine signature and the only one involved in the transaction. Irving Koren admits that he made out these invoices without having any orders and without making any shipments. He committed these acts and made these representations for the purpose of defrauding the bank out of the money loaned in reliance on such conduct. These invoices aggregate $21,476.29. The amount loaned by the plaintiff thereon was the sum of $17,341.52. The limit of the defendant's liability on the blanket bond under clause (E) is $10,000.00."

The pertinent provision of the bond, describing the coverage upon which plaintiff relies, indemnifies plaintiff against

"(E) Any loss through the Insured's having, in good faith and in the course of business, whether for its own account or for the account of others, in any representative, fiduciary, agency or any other capacity, either gratuitously or otherwise, purchased or otherwise acquired, accepted or received, or sold or delivered, or given any value, extended any credit or assumed any liability, on the faith of, or otherwise acted upon any securities, documents or other written instruments *which prove to have been counterfeited or forged as to the signature* of any maker, drawer, issuer, endorser, assignor * * *." (Emphasis added.)

The controversy herein centers around the meaning of the language "forged as to the signature." The defendant argues that since the signatures of Koren on the assignments were genuine no forgery is present because "forgery" is the making of a writing which purports to be the act of another, and that a false statement of fact in the body of an instrument by which a person is deceived and defrauded is not a forgery—the false statement in the instant case being that the invoices represented goods actually sold and bona fide indebtedness. The plaintiff insists that forgery is not confined to the false writing of another's name, that the essence of forgery does not so much consist in counterfeiting as in endeavoring to give the appearance of truth to a deceit and falsity, which can be accomplished by making a man's own act appear to have been done under circumstances which would make it valid, when in fact it is false.

Although our disposition of this cause **is** governed by Wisconsin law, no Wisconsin decisions have been found which cast any light on the problem presented for adjudication. Both parties in arguing for their respective definitions of forgery have referred the court to nu-

merous decisions of other jurisdictions and statutes defining the crime of forgery. We shall not discuss in detail the many decisions defining forgery which, with minor variation, fall essentially into two groups.

Pasadena Investment Co. v. Peerless Cas. Co., 132 Cal.App.2d 328, 282 P.2d 124, 52 A.L.R.2d 203, is typical of the view contended for by the defendant. In that case the bond indemnified the plaintiff against "any loss * * * through having * * * purchased or otherwise acquired, * * * or given any value, extended any credit * * * upon any * * * securities, obligations or other written instruments which prove to have been forged * * *." The plaintiff had purchased certain purported accounts receivable evidenced by invoices representing goods sold. In addition, the plaintiff received written receipts signed by the person who allegedly had received the services covered by the invoices. The signatures of the assignors were genuine as were the signatures on the receipts, but the invoices and receipts were false and did not represent any bona fide indebtedness. The only factual differences between Pasadena and the instant case are that there the person to whom the invoices had been made had signed a receipt acknowledging the indebtedness, whereas no such acknowledgement is present here; and the assignors in that case purported to act for their own account, whereas here an agent purported to act for his principal.

The court held that the acts described above did not constitute forgery within the coverage of the bond. Quoting from another California decision, the court said:

"When the crime is charged to be the false making of a writing, there must be the making of a writing which falsely *purports to be the writing of another.* * * * A false statement of fact in the body of the instrument * * * by which a person is deceived and defrauded, is not forgery. There must be a de-sign to pass as the genuine writing of another person that which is not the writing of such other person." 282 P.2d at page 125.

Quick Service Box Co. v. St. Paul Mercury Indemnity Co., 7 Cir., 95 F.2d 15, decided by this court and followed by the District Court in the instant case, represents the view urged by the plaintiff. In that case the bond indemnified the "plaintiff against loss through the payment by any depositing bank of any check drawn by or purporting to be drawn by plaintiff at any of its offices upon which the 'signature of the insured' or 'the signature of any endorser' 'shall have been forged' * * *." It was there stipulated that one Tawes was employed by the plaintiff as office manager and bookkeeper. Tawes was not authorized to sign checks unless they were complete on their face and had been signed by one of two vice presidents of the company. Tawes was not authorized to draw checks payable to "cash," except for certain purposes and in an amount not exceeding $50.00. He secured the signatures of one of the two vice presendents on blank checks. Tawes then filled in the checks and designated "cash" as payee. He countersigned the checks, cashed them and converted the proceeds to his own use. The fraud thus perpetrated on the plaintiff-employer by Tawes was held to constitute a forgery of the signature of the insured within the provisions of the bond although each signature which appeared on the checks was the genuine signature of the one affixing the signature.

In discussing the meaning of forgery, this court approved the following:

"to constitute forgery there must be a false making; that this might be accomplished by the fraudulent application of a false signature to a true instrument *or a real signature to a false instrument; and that the essence of forgery is an intent to injure or defraud at the time the action complained of is*

done." (Emphasis added.) 95 F. 2d at pages 16–17.

▆ The differences in the terminology utilized in the bonds in the Pasadena, Quick and instant cases do not appear to be of dispositive significance, and thus the pivotal issue relates to the meaning of the word "forgery." We think that the definition enunciated in the Quick case is eminently sound and is in accord with the intent of the parties to the bond in question. We must admit however, that Quick apparently represents a minority view. See, e.g., Fitzgibbons Boiler Co. v. Employers' Liability Assur. Corp., 2 Cir., 105 F.2d 893. Although Quick may be in the legal minority, it is in harmony with the dictionary definition of "forgery."

> "Act of forging, fabricating or producing falsely; esp., the crime of falsely and fraudulently making or altering a writing or instrument which if genuine would, or on its face might, be of some legal effect upon the rights of others." Webster's New International Dictionary, 2d Ed. See also 1 Bouv.Law Dict., Rawles Third Rev., p. 1283.

In addition, the acts of Koren would appear to fall within the purview of the statutory definition of the crime of forgery extant when the assignments were made. Wis.Stat. (1953) § 343.-56.

> "Forgery and counterfeiting. Any person who shall falsely make, alter, forge or counterfeit * * * any * * * assignment of a bill of exchange * * * or other assignable instrument * * * with intent to injure or defraud shall be punished * * *."

The defendant insists that the Quick case is nevertheless factually distinguishable from the instant case. Suffice it to say that, with one possible exception, the defendant is belaboring distinctions without a difference. The exception to which we refer is that in Quick the acts of the agent Tawes were unauthorized, whereas here, although the District Court proceeded on the assumption that the acts of Koren were unauthorized, the stipulated facts are silent as to the question of authority or lack of it. However, the defendant apparently fails to take into account the significance of the question of the agent's authority in the Quick case. There an employer was suing to recover for a loss occasioned by the fraud of one of its employees. If the acts of the employee had been authorized there would have been no fraud or loss. In other words, a principal will not be heard to complain of the authorized acts of its agent. But that is not the case here, for a third party was defrauded by the acts of an agent and the principal's authorization of Koren's fraudulent acts would not render them any less fraudulent.

▆ The question of the agent's authority presents the more general problem of whether, and under what circumstances, an agent may commit a forgery. The decisions dealing with this problem are in hopeless conflict. See 37 C.J.S. Forgery § 8. In Fitzgibbons Boiler Co. v. Employers' Liability Assur. Corp., 2 Cir., 105 F.2d 893, 896, the court said: "Where, as here, the agent had a general authority to sign for the principal, the rule in the commercial cases is that the principal is bound and hence that there is no forgery." It would seem that the question of whether or not the principal is bound by the acts of the agent in cases where a third party is defrauded relates more properly to the question of loss under the provisions of the bond, than to the question of forgery. In any event, our decision in the Quick case resolves this problem, for the court said, 95 F.2d at page 17, "Then, too, *though one may under certain conditions have authority to sign certain names, yet, if he sign such to a false document or to an unauthorized one, it is forgery.*" (Emphasis added.)

Thus, in the instant case, although Koren's acts may have been authorized, or although unauthorized, the corporation was nevertheless bound by them,

he signed his name to a false document for the purpose of defrauding plaintiff. The decisive factor here is the falsity of the invoices, not Koren's power to bind his principal.

The judgment of the District Court is affirmed.