The **FIRST NATIONAL BANK OF SOUTH CAROLINA OF CO-LUMBIA, Appellee,**

v.

**GLENS FALLS INSURANCE COMPANY, Appellant.**

No. 8494.

United States Court of Appeals Fourth Circuit.

Argued March 26, 1962.

Decided May 28, 1962.

Walter H. Hood, Anderson, S. C. (Francis R. Fant, Anderson, S. C., on the brief), for appellant.

W. C. Boyd, Columbia, S. C. (Boyd, Bruton & Lumpkin, Columbia, S. C., on the brief), for appellee.

Before SOPER and HAYNSWORTH, Circuit Judges, and FIELD, District Judge.

SOPER, Circuit Judge.

This suit was brought by the Bank against the Insurance Company to re-cover a loss of $12,000 which the Bank suffered on loans to the Shirtmaster Company, Inc., a South Carolina corporation, which were secured by fictitious invoices falsely represented by the borrower to be genuine. Liability is based on a blanket bond in the sum of $100,000 issued by the Insurance Company to the Bank whereby the Insurance Company agreed amongst other things to indemnify the Bank against any loss through the insured's having, in good faith and in the course of business, extended credit on the faith of or otherwise acted upon any securities or written instruments which prove to have been counterfeited or forged as to the signature of any maker. The full wording of the relevant portion of the bond is as follows:

"(E)—SECURITIES:

"Any loss through the insured's having in good faith and in the course of business whether for its own account or for the account of others, in any representative, fiduciary, agency, or any other capacity, either gratuitously or otherwise, purchased or otherwise acquired, accepted or received, or sold or delivered or given any value, extended any credit or assumed any liability, on the faith of, or otherwise acted upon any securities, documents or other written instruments which prove to have been counterfeited or forged as to the signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent or registrar, acceptor, surety or guarantor, or as to the signature of any person signing in any other capacity, or raised or otherwise altered or lost or stolen, or through the insured's having, in good faith and in the course of business, guaranteed in writing or witnessed any signature, whether for valuable consideration or not and whether or not such guaranteeing or witnessing is ultra vires, the insured, upon any transfers, assignments, bills of sale, powers of attorney, guarantees, endorsements or other documents upon or in con-

nection with any securities, obligations or other written instruments and which pass or purport to pass title to such securities, obligations or other written instruments; EXCLUDING, HOWEVER, any loss through FORGERY OR ALTERATION of, on or in any checks, drafts, acceptances, withdrawal orders or receipts for the withdrawal of funds or property, certificates of deposit, letters of credit, warrants, money orders or orders upon public treasuries; and excluding, further, any loss specified in subdivisions (1) and (2) of Insuring Clause (D) as printed in this bond, whether or not any amount of insurance is applicable under this bond to Insuring Clause (D).

"Mechanically reproduced facsimile signatures are treated the same as handwritten signatures."

In "Exclusions" under the section of the Bond designated, "THE FOREGOING AGREEMENT IS SUBJECT TO THE FOLLOWING CONDITIONS AND LIMITATIONS", the following exclusion is found in Section 1(d):

"Any loss, the result of the complete or partial nonpayment of or default upon any loan made by or obtained from the insured, whether procured in good faith or through trick, artifice, fraud or false pretenses, except when covered by Insuring Clauses (A), (D), or (E)".

The losses in this case occurred in connection with loans made by the Bank to the Shirtmaster Company on its promissory notes secured by what appeared to be accounts receivable which the company assigned to the Bank. On December 6, 1957 the Bank loaned to the company the sum of $7000 for which the company gave the Bank its promissory note executed in the name of the company by Joseph Kaplan, Secretary-Treasurer, wherein it assigned to the Bank as collateral security two attached invoices for $1975 and $5568, respectively, purporting to show that the company had sold

and delivered merchandise in these amounts to Bud Berman Sportswear, Inc., of New York. On December 18 a similar loan of $10,000 was made for which the company gave to the Bank its promissory note executed in the name of the company by Joseph Kaplan, Secretary-Treasurer, wherein it assigned to the Bank as collateral security three attached invoices in the sum of $3315.73, $2557.50 and $5259.75, respectively, purporting to show that the company had sold and delivered merchandise in these amounts to Bud Berman Sportswear, Inc., of New York.

At the times these loans were made, the notes given, and the invoices assigned the Shirtmaster Company represented to the Bank that Bud Berman Sportswear, Inc. was indebted to it for the merchandise described in the invoices, but the merchandise had never been ordered and had never been received by Sportswear, and it was not indebted to Shirtmaster for these amounts.

The Shirtmaster notes to the Bank were never paid and the bank made claim on the Insurance Company for $17,000 less $5000 since, under the terms of an endorsement on the bond, $1000 was deductible for each of the five spurious accounts receivable, but the Insurance Company denied coverage.

The case was submitted to the District Judge upon an agreed statement of facts and the Judge found for the Bank and entered judgment for $12,000. D.C., 197 F.Supp. 264. He was of the opinion that the invoices were "counterfeit" within the meaning of this term as defined in Webster's Twentieth Century Dictionary as something made in imitation of something else with intention to defraud by passing the false copy for genuine. He found support for his conclusions in the decision of the Third Circuit in Fidelity Trust Company v. American Surety Company of New York, 268 F.2d 805, where, under a similar bond issued by an insurance company to a bank, judgment was given for the bank which had suffered losses for moneys loaned on promissory

notes secured by fictitious invoices. The court held that the words "counterfeit" and "forged" were not synonymous and, without deciding whether the invoices were forged, held that they were counterfeited in that they purported to be something they were not. The case is directly in point and supports the judgment below.

We find difficulty, however, in following this line because neither the opinion of the District Judge in the pending case nor the opinion in the Third Circuit gives adequate consideration to the limitation of the bond which confines the recovery to losses on securities or written instruments which prove to have been counterfeited or forged *as to the signature.* In the case at bar as in the Third Circuit the promissory notes were signed and the fictitious invoices were described therein and attached thereto but were not signed separately. The District Judge gave no consideration in his opinion to the phrase "as to the signature" other than to mention that the invoices bore no signature but were assigned by an officer of Shirtmaster in writing; and the opinion in the Third Circuit simply concludes without discussion that the limitation applies to forged but not to counterfeited documents.

██ In our judgment the limitation cannot be ignored. It is familiar law in South Carolina and elsewhere that the terms of an insurance contract must be construed in favor of the insured and against the insurer where the words of the policy are ambiguous, but where there is no ambiguity a contract of insurance, like other contracts, must be construed according to the plain and ordinary meaning of its terms. Pitts v. Glens Falls Indemnity Co., 222 S.C. 133, 72 S.E.2d 174; Quinn v. State Farm Mut. Automobile Insurance Co., 238 S.C. 301, 120 S.E.2d 15. The meaning of the contract in the case at bar seems to us to be plain. Protection is afforded to the insured against loss incurred by extending credit on a written instrument that is found to have been counterfeited or forged as to signature. There is no comma after the word "counterfeited" and no other indication that the phrase does not qualify both terms of evil import; and there is positive indication that it is the counterfeited or forged signature to the fraudulent document rather than false statements in the document or the falsity of the document in its entirety which alone gives rise to the liability of the insurer. Thus, there is reference in the bond after the words "counterfeited or forged" to the signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent or registrar, acceptor, surety or guarantor, or as to the signature of any person signing in any other capacity. Obviously, counterfeited as well as forged written instruments may be signed and we do not think that it can fairly be said that this list of persons refers only to forgeries and not to counterfeits. Also included in the section is a clause as to loss incurred by relying on written documents which prove to have been "raised or otherwise altered or lost or stolen". As to these no mention of the signature is made, thus creating a special class of documents which may give rise to liability whether the signature is genuine or not. The omission of the phrase, as to the signature, in describing this class of documents and the inclusion of the phrase in the description of the documents first mentioned above is worthy of note. Immediately following is the clause insuring against loss incurred through the insured having guaranteed or witnessed a signature, again demonstrating the emphasis placed by the draftsman on the signature rather than on the contents of the writing, or its falsity as a whole. At the end of Section (E) of the bond it is provided that mechanically reproduced facsimile signatures are treated the same as handwritten signatures and no reason appears why this more liberal provision should be applied to forged but not to counterfeited instruments. Finally, there is the significant exclusion clause that losses which result from the non-

payment of a loan obtained by fraud or false pretenses are not covered by the bond. This provision obviously shows that the bond is not intended to cover losses incurred through reliance on false pretenses generally unless the fraud is accomplished by the use of a counterfeited or forged signature.

In this discussion we have assumed as did the Third Circuit that the terms "counterfeited" and "forged" are not synonymous. Even so, no one explains why the limitation as to signature should be applied to forgeries and not to counterfeits. If on the other hand we assume, as did the District Judge in the case at bar as well as Judges in other cases cited in the footnote, infra, that the purport and effect of the two terms is substantially the same, no reason can be given for broadening the scope of one term rather than the other. It should be added that Section (D) of the bond covers any loss through forgery or alteration of checks, drafts, acceptances or receipts for the withdrawal of funds or property,

etc., and that in this section the limitation as to signature does not appear. We find no escape from the conclusion that the bank's loss in the pending case is not covered by the bond. A similar conclusion was reached in United States Fidelity & Guaranty Co. v. First Nat. Bank of Ft. Morgan, Colo.1961, 364 P.2d 202.

Disregarding the limitation in Section (E) of the bond as to signature of the maker, endorser, etc., the opinions of the courts are divided as to whether a document containing a false statement may be said to be counterfeited or forged within the meaning of these terms in the bond if it is circulated as genuine by the person who actually made it. The majority of the authorities hold the negative view as will appear from the subjoined footnote; but we do not meet this question in the case at bar because the invoices were neither counterfeited nor forged as to signature and, therefore, in our opinion were not covered by the contract.[1]

Reversed.

---

1. In the following cases instruments fraudulently executed or containing false statements but otherwise genuine, are held not to have been forged or counterfeited within the meaning of those terms undefined in a banker's bond: United States Fidelity & Guaranty Co. v. First Nat. Bank of Ft. Morgan, Colo.1961, 364 P.2d 202; State Bank of Poplar Bluff v. Maryland Casualty Co., 8 Cir.1961, 289 F.2d 544; Torrence Nat. Bank v. Aetna Casualty & Surety Co., 9 Cir.1958, 251 F.2d 666; Pasadena Investment Co. v. Peerless Casualty Co., 1955, 132 Cal.App.2d 328, 282 P.2d 124, 52 A.L.R.2d 203; Fitzgibbons Boiler Co. v. Employers' Liability Assurance Corp., 2 Cir.1939, 105 F.2d 893; and see annotation, 52 A.L.R.2d 207, 215–218.

Holding to the contrary are: Fidelity Trust Co. v. American Surety Co. of New York, 3 Cir.1959, 268 F.2d 805; Security Nat. Bank of Durand v. Fidelity & Cas. Co. of New York, 7 Cir.1957, 246 F.2d 582; Provident Trust Co. v. Nat. Surety Co., 3 Cir.1943, 138 F.2d 252; Quick Service Box Co. v. St. Paul Mercury Indemnity Co., 7 Cir.1938, 95 F.2d 15; and see 52 A.L.R.2d 207, 210–215.

Notwithstanding this division, the cases generally agree that the meaning of these terms, when not defined within the bond itself, is to be determined by the meaning given to them in the applicable criminal law—see cases cited supra, and 52 A.L.R. 2d 207, 208. In criminal cases the great weight of authority holds false statements in or fraudulent execution of otherwise valid instruments not to be forgery within its common law or unexpanded statutory meaning. Greathouse v. United States, 4 Cir., 170 F.2d 512, 514; United States v. Brown, 2 Cir.1957, 246 F.2d 541; Marteney v. United States, 10 Cir.1954, 216 F. 2d 760; 41 A.L.R. 229, supplemented, 49 A.L.R. 1529, 51 A.L.R. 568.

The applicable law of South Carolina, whether we look to the common law or the criminal statutes, seems to be in accord with the minority view. McConnell v. Kennedy, 1888, 29 S.C. 180, 7 S.E. 76; State v. Zimmerman, 1908, 79 S.C. 289, 60 S.E. 680; 1952 Code of S. Carolina § 16–351.