**452**

NORTH CAROLINA NATIONAL BANK,
Plaintiff,

v.

UNITED STATES CASUALTY COM-
PANY, Defendant.

Civ. No. 1572.

United States District Court
W. D. North Carolina,
Charlotte Division.

Sept. 7, 1962.

Whiteford S. Blakeney, Charlotte, N. C., for plaintiff.

Carswell & Justice, Charlotte, N. C., John H. Anderson, Jr., Raleigh, N. C., for defendant.

WARLICK, Chief Judge.

This action was brought by the Bank as the insured, under a Bankers Blanket Bond issued by the defendant, to recover losses sustained by it as the result of a series of loan transactions.

This case was tried before the Court sitting with a jury, but at the close of all the evidence, the attorneys for both plaintiff and defendant agreed that the demand for a jury trial had at that time become unnecessary, and each, then, representing the parties to the action, agreed that the jury could be waived and the matter submitted to the Court for determination.

The plaintiff is a banking corporation organized and existing under the laws of the United States and has its principal office and one of its places of business in Charlotte, North Carolina. The plaintiff came into existence as a result of the consolidation of two banking corporations, one of which was the American Commercial Bank, which had its principal office and place of business in Charlotte, and by reason of such consolidation the plaintiff herein succeeded to and is now the owner of this cause of action.

The defendant is a corporation organized and existing under the laws of the state of New York, and is engaged in the surety and insurance business.

On or about April 1, 1958, the defendant, for a valuable consideration, executed and delivered to the American Commercial Bank, herein referred to as the "Bank", a bond, which the defendant designated as its bond, Number U47820, a "Bankers Blanket Bond-Standard Form No. 24", under which the defendant undertook to indemnify the Bank in the event it should in the course of its business suffer, or in the course of its business had suffered, losses of the nature described in the bond.

Over a period of years, the Bank, in line with its business, at various times loaned money and extended credit to the C. K. Callaham & Sons Lumber Company, a corporation having its office and place of business in Charlotte, North Carolina, and herein referred to as "The Lumber Company". All such money loaned by the Bank to the Lumber Company was evidenced by promissory notes and se-

cured by a written assignment of certain accounts receivable. Each of the accounts receivable pledged to the Bank was evidenced by a duplicate copy of the invoice from the Lumber Company to its customer for that particular account.

At various times the Lumber Company made payment to the Bank of the collections received on these accounts assigned and withdrew those representative invoices pledged, and at the same time in many instances, borrowing anew and pledging other accounts receivable to cover the new loans. It was a continuous process of borrowing, pledging and paying.

Sometime in 1950, as testified to by J. W. Callaham, who was then President and Treasurer of the Lumber Company, it began pledging accounts to the Bank that did not in fact exist. That is, the Lumber Company would wholly manufacture accounts, type up invoices to represent these fictitious accounts, destroy the original and pledge the false duplicate to the Bank as security for the loan. These false accounts were also entered in the books of the Lumber Company to aid in concealing the fraud. At first these spurious invoices represented only a small percentage of those invoices pledged to the Bank, but by August of 1959, when this practice was discovered, the ratio was 75%, or three false invoices to every valid one.

On August 14, 1959, the Bank learned that a major portion of the invoices pledged to it by the Lumber Company were false. The total face amount of those fictitious invoices at this time was $414,017.10. On this date the total amount of the indebtedness of the Lumber Company to the Bank was $291,373.-39. Through collections of the valid accounts and dividends in bankruptcy proceedings, the Bank was able to reduce the loss to $211,474.76. The Lumber Company being bankrupt, and the loss mentioned above being final, this action was brought by the plaintiff to recover under the bond.

The invoices in question were represented as duplicate copies of original instruments evidencing accounts receivable. They were false documents made with the intention to deceive and defraud.

Within the terms of the bond there are certain types of losses that are excluded from its coverage. Section 1(d) of the bond provides that the bond does not cover,

"Any loss, the result of the complete or partial non-payment of or default upon any loan made by or obtained from the insured, whether procured in good faith or through trick, artifice, fraud or false pretenses, except when covered by Insuring Clauses (A), (D), or (E)."

Clauses (A), and (D) are not applicable to this case nor are they relied upon by either of the parties. Therefore, the question presented is whether the loss sustained by the Bank is covered by the insuring Clause "(E)". If not, then the exclusion described above in Section 1(d) governs and the loss incurred is not compensable under the bond.

The pertinent provision of the bond, describing the coverage upon which the plaintiff relies, indemnifies plaintiff against:

"(E)—SECURITIES:

"Any loss through the insured's having, in good faith and in the course of business, whether for its own account or for the account of others, in any representative, fiduciary, agency or any other capacity, either gratuitously or otherwise, purchased or otherwise acquired, accepted or received, or sold or delivered, or given any value, extended any credit or assumed any liability, on the faith of, or otherwise acted upon any securities, documents or other written instruments which prove to have been counterfeited or forged as to the signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent or registrar, acceptor, surety or guarantor or as to the signature of any person signing in any other capacity, or raised or otherwise altered or lost

454

or stolen, or through the insured's having, in good faith and in the course of business, guaranteed in writing or witnessed any signatures, whether for valuable consideration or not and whether or not such guaranteeing or witnessing is ultra vires the insured, upon any transfers, assignments, bills of sale, powers of attorney, guarantees, endorsements or other documents upon or in connection with any securities, obligations or other written instruments and which pass or purport to pass title to such securities, obligations, or other written instruments; EXCLUDING, HOWEVER, any loss through FORGERY OR ALTERATION of, on or in any checks, drafts, acceptances, withdrawal orders or receipts for the withdrawal of funds or Property, certificates of deposit, letters of credit, warrants, money orders or orders upon public treasuries; and excluding, further, any loss specified in subdivisions (1) and (2) of Insuring Clause (D) as printed in this bond, whether or not any amount of insurance is applicable under this bond to Insuring Clause (D).

"Mechanically reproduced facsimile signatures are treated the same as handwritten signatures."

With the exception of the difference in the amount involved, this case is factually identical with the recent case of First National Bank Of South Carolina Of Columbia v. Glens Falls Insurance Company, 4th Cir., 304 F.2d 866, 1962. In that case, as in the one at bar, the bank had loaned money upon a pledge of fictitious invoices falsely represented by the borrower to be genuine.

The language of the insurance contract in that case was identical to the language of clause "(E)" in the instant case. The Court of Appeals, speaking through Judge Soper, held that the language of the bond clearly implies that the phrase "as to the signature," modifies the word "counterfeited", and in order to sustain a recovery under the bond, the insured must show that the documents in question, i. e. the invoices, bear counterfeited signatures. In writing for the majority, Judge Soper says:

"The meaning of the contract in the case at bar seems to us to be plain. Protection is afforded to the insured against loss incurred by extending credit on a written instrument that is found to have been counterfeited or forged as to signature. There is no comma after the word "counterfeited" and no other indication that the phrase does not qualify both terms of evil import; and there is positive indication that it is the counterfeited or forged signature to the fraudulent document rather than false statements in the document or the falsity of the document in its entirety which alone gives rise to the liability of the insurer."

This interpretation of the language of the bond is controlling in the instant case. Here, there were one hundred and fourteen false invoices pledged to the bank as security. Of these, one hundred were signed by J. W. Callaham as disclosed by his own admission. His signature was neither forged nor counterfeited. The other fourteen were not signed at all. Thus, there was no reliance on any signature at all as concerns the unsigned invoices. Since the invoices were neither counterfeited nor forged as to signature, the loss incurred by the bank was not covered by clause (E) of the bond in question. This being so, the plaintiff cannot recover from the defendant in the action herein.

## CONCLUSIONS OF LAW

The Court has jurisdiction of the parties and the subject matter of this action. 28 U.S.C.A. § 1332.

The losses incurred by the plaintiff were not insured against within the meaning of the bond in question and the plaintiff is not entitled to recover therefor from the defendant in this action.

Counsel will submit decree in accordance with this memorandum opinion.