**NORTH CAROLINA NATIONAL BANK,**
Appellant,

v.

**UNITED STATES CASUALTY COM-PANY,** Appellee.

No. 8812.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 16, 1963.

Decided May 20, 1963.

---

Whiteford S. Blakeney, Charlotte, N. C. (Blakeney, Alexander & Machen, Charlotte, N. C., on brief), for appellant.

John H. Anderson, Jr., Raleigh, N. C., and Guy T. Carswell, Charlotte, N. C. (Smith, Leach, Anderson & Dorsett, Raleigh, N. C., James F. Justice, and Carswell & Justice, Charlotte, N. C., on brief), for appellee.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and J. SPENCER BELL, Circuit Judges.

HAYNSWORTH, Circuit Judge.

Under its "Bankers Blanket Bond," the Bank seeks to recover from the casualty company the amount of a large loss it suffered on a loan purportedly secured by accounts receivable, which, in fact, did not exist. It does so on the theory that copies of invoices deposited with and assigned to the Bank as evidence of the receivables were counterfeited within the meaning of the indemnity bond, because, though issued and assigned by authorized officials of the debtor, the invoices were intrinsically false in their representation that goods had been sold and delivered.

Relying upon our recent decision in First National Bank of South Caro-lina v. Glens Falls Ins. Co., 4 Cir., 304 F.2d 866, the District Court held that the bond afforded no coverage under the circumstances of this case. On appeal, the Bank's essential position is that we should reconsider our decision of less than a year ago, or, at least, hold that it is inapplicable under the laws of North Carolina. We find no possible distinction between the two cases and no significant difference between the laws of North Carolina and those of South Carolina which governed our decision in the First National Bank of South Carolina case. We adhere to our earlier decision.

For many years C. K. Callaham and Sons Lumber Company of Charlotte, North Carolina, had a line of credit with a predecessor of the plaintiff Bank. The Callaham loans were secured by an assignment of the accounts receivable represented by specific, duplicate invoices deposited with the Bank and assigned to it. Until sometime before 1950 Callaham's debtors were notified of the assignment and were instructed to remit to the Bank, but the notification procedure was then abandoned. Thereafter, Callaham's customers were not notified when their accounts were assigned by Callaham, and they remitted direct to Callaham. However, the Bank regularly reviewed Callaham's financial statements and its customer ledger accounts, and by such means acquired assurance that Callaham did have a substantial volume of business, a substantial volume of outstanding receivables, and that the invoices, copies of which were deposited with it, represented actual, outstanding receivables.

In the 1950's after J. W. Callaham had become the principal officer of the lumber company, its business began to decline. He began to include in the assignments to the Bank some duplicate invoices representing fictitious transactions. He caused the preparation of invoices, regular in all respects except that the transactions they purported to represent had not occurred. He would destroy the original of each such invoice, deposit one

duplicate copy with the Bank and file another copy in his customers' account file. The purported transaction would then be recorded on the lumber company's customer ledger sheets, and it was reflected in the lumber company's annual and other statements submitted to the Bank. As time went on, the proportion of such fictitious accounts to collectible accounts increased, with the result that when the lumber company's house finally collapsed approximately three-fourths of the accounts assigned to the Bank were fictitious and uncollectible.

When Callaham's deceit came to light, the Bank held a collateral note of the lumber company in the amount of $300,-000. Attached to the note was a list of accounts receivable and duplicate invoices which were in accord with the list. In a collateral note agreement, the lumber company represented that each of the assigned accounts was genuine and outstanding in the amount shown, and that there were no setoffs or charge backs. At the time of discovery, the Bank held accounts, fictitious and valid, aggregating $414,017.10, and the lumber company's indebtedness to the Bank was $291,397.39. Thereafter, the Bank received payments on valid accounts receivable and dividends from the Trustee in Bankruptcy of the lumber company. Such receipts reduced its loss to $211,-474.76, which is the amount it seeks to recover from the casualty company.

The indemnity bond here is identical in all respects to that which we considered in the First National Bank of South Carolina case. In the part essential here it provided coverage for "Any loss through the Insured's having, in good faith and in the course of business * * * given any value * * * on the faith of * * * any securities, documents or other written instruments which prove to have been counterfeited or forged as to the signature of any maker, drawer * * * or as to the signature of any person signing in any other capacity * * *."

Among the exclusions, however, it provided:

"THIS BOND DOES NOT COVER:
" * * *

"(d) Any loss the result of the complete or partial non-payment of or default upon any loan made by or obtained from the Insured, whether procured in good faith or through trick, artifice, fraud or false pretenses, except when covered by Insuring Clause (A), (D) or (E)."

In First National Bank of South Carolina v. Glens Falls Ins. Co., 4 Cir., 304 F.2d 866, we held that invoices which were fictitious because of falsity of their implicit representation that a corresponding, collectible account receivable existed were not "counterfeited or forged as to the signature" of anyone. In dealing with the contention there that the word "counterfeited" was not qualified by the words "as to the signature," we said:

"In our judgment the limitation cannot be ignored. It is familiar law in South Carolina and elsewhere that the terms of an insurance contract must be construed in favor of the insured and against the insurer where the words of the policy are ambiguous, but where there is no ambiguity a contract of insurance, like other contracts, must be construed according to the plain and ordinary meaning of its terms. Pitts v. Glens Falls Indemnity Co., 222 S.C. 133, 72 S.E.2d 174; Quinn v. State Farm Mut. Automobile Insurance Co., 238 S.C. 301, 120 S.E. 2d 15. The meaning of the contract in the case at bar seems to us to be plain. Protection is afforded to the insured against loss incurred by extending credit on a written instrument that is found to have been counterfeited or forged as to signature. There is no comma after the word 'counterfeited' and no other indication that the phrase does not qualify both terms of evil import; and there is positive indication that it is the counterfeited or forged signature to the fraudulent docu-

ment rather than false statements in the document or the falsity of the document in its entirety which alone gives rise to the liability of the insurer. Thus, there is reference in the bond after the words 'counterfeited or forged' to the signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent or registrar, acceptor, surety or guarantor, or as to the signature of any person signing in any other capacity. Obviously, counterfeited as well as forged written instruments may be signed and we do not think that it can fairly be said that this list of persons refers only to forgeries and not to counterfeits. Also included in the section is a clause as to loss incurred by relying on written documents which prove to have been 'raised or otherwise altered or lost or stolen'. As to these no mention of the signature is made, thus creating a special class of documents which may give rise to liability whether the signature is genuine or not. The omission of the phrase, as to the signature, in describing this class of documents and the inclusion of the phrase in the description of the documents first mentioned above is worthy of note. Immediately following is the clause insuring against loss incurred through the insured having guaranteed or witnessed a signature, again demonstrating the emphasis placed by the draftsman on the signature rather than on the contents of the writing, or its falsity as a whole. At the end of Section (E) of the bond it is provided that mechani-cally reproduced facsimile signatures are treated the same as handwritten signatures and no reason appears why this more liberal provision should be applied to forged but not to counterfeited instruments. Finally, there is the significant exclusion clause that losses which result from the non-payment of a loan obtained by fraud or false pretenses are not covered by the bond. This provision obviously shows that the bond is not intended to cover losses incurred through reliance on false pretenses generally unless the fraud is accomplished by the use of a counterfeited or forged signature."

Most of the courts which have considered the problem in the same, or a similar, context have reached a similar conclusion.[1] Two courts have come to the opposite conclusion. The Court of Appeals for the Third Circuit has held that such invoices were counterfeited within the meaning of the bond when the transactions they purported to represent never took place,[2] while the Court of Appeals for the Seventh Circuit has held that under similar circumstances such duplicate invoices were forged.[3] In First National Bank of South Carolina, however, we pointed out that the Third Circuit had not considered the qualifying phrase, "as to signature," and we expressly declined to follow its lead. The cases in the Seventh Circuit were cited in Footnote 1 of the opinion in the First National Bank of South Carolina case, but they were not extensively discussed, for there was no contention there that the invoices were "forged as to signature."

1. First Nat. Bank of Memphis v. Aetna Casualty & Surety Co., 6 Cir., 309 F.2d 702; United States Fidelity & Guaranty Co. v. First Nat. Bank of Ft. Morgan, 147 Colo. 446, 364 P.2d 202; State Bank of Poplar Bluff v. Maryland Casualty Co., 8 Cir., 289 F.2d 544; Torrance Nat. Bank v. Aetna Casualty & Surety Co., 9 Cir., 251 F.2d 666; Pasadena Investment Co. v. Peerless Casualty Co., 132 Cal.App.2d 328, 282 P.2d 124, 52 A.L.R.2d 203; Fitzgibbons Boiler Co. v. Employers' Liability Assurance Corp., 2 Cir., 105 F.2d 893.

2. Fidelity Trust Co. v. American Surety Co. of New York, 3 Cir., 268 F.2d 805; and see Provident Trust Co. v. National Surety Corporation, 3 Cir., 138 F.2d 252.

3. Security National Bank of Durand v. Fidelity & Casualty Company of New York, 7 Cir., 246 F.2d 582; and see Quick Service Box Co. v. St. Paul Mercury Indemnity Co., 7 Cir., 95 F.2d 15.

■■ Here, there is such a contention. It is founded upon the fact that all of the duplicate invoices deposited with the Bank bore a form of assignment and notice to the purported customer to remit to the Bank. Such notices of assignment had been affixed to all original invoices during the period when the notification procedure had been followed by the Bank and the lumber company. Such assignments and notices had been omitted from all original, valid invoices after the notification procedure was abandoned. For some reason, however, Callaham continued to affix such legends upon the duplicate invoices deposited with the Bank, and, in most instances, these were actually signed by J. W. Callaham for the lumber company.

Falsity here did not reside in the assignment, however. The falsity lay in the implicit misrepresentation made to the Bank when the lumber company deposited with the Bank the duplicate invoices. Certainly as the term "forgery" is commonly understood, the fact that an instrument contains a false representation does not lead to the conclusion that the instrument is forged or "forged as to signature." The negotiator of a worthless check bearing his signature represents that he has on deposit sufficient funds with which the check may be paid, but, when he affixes his own signature to the worthless check and does not represent himself to be another, his crime is distinct from that of the forger.[4] Moreover, here, the assignments and the execution of the assignments were quite unnecessary, for the deposit of the duplicate invoices under the loan agreement was quite sufficient, *inter sese*, for the transfer to the Bank of the rights of the lumber company in the receivable the duplicate invoice represented or purported to represent. In North Carolina, it has been held that falsification of a signature is not forgery, unless the signature is necessary to the validity of the instrument or the effectuation of the transaction.[5]

Of course, the lumber company and its officer, Callaham, were guilty of gross misrepresentation and of false pretense, but losses upon loans secured by such means are not within the coverage of the bond. The deposit of the duplicate invoice carried with it the implicit representation that the customer whose name appeared thereon had ordered goods which the lumber company had delivered or shipped, that the purchase price was the amount which appeared upon the invoice, that the purchase price had not been paid, and that the customer had no offsetting claim against the lumber company. These same representations were contained in more explicit form in the loan agreement, though the Bank, and apparently no one else, has suggested that the loan agreement, on that account, is counterfeited or forged as to signature. The financial statements which the lumber company filed with the Bank and upon which the Bank relied were equally false, for they included in reported accounts receivable all of these spurious transactions. The ledger sheets which reflected these fictitious transactions, which the Bank inspected and upon which the Bank relied, were similarly false, but no more can be said of any of these instruments, including the duplicate invoices, than that they were all part of the scheme of misrepresentation of the lumber company's sales and outstanding receivables. All of them were clearly the acts of Callaham and of the lumber company, and there was no misrepresentation of the person, or persons, responsible for them. The duplicate invoices, as the other writings used to effect and maintain the misrepresentation, cannot be said to have been "counterfeited or forged as to signature."

4. See Greathouse v. United States, 4 Cir., 170 F.2d 512, 514; United States v. Brown, 2 Cir., 246 F.2d 541; Marteney v. United States, 10 Cir., 216 F.2d 760; Goucher v. State of Nebraska, 113 Neb. 352, 204 N.W. 967, 41 A.L.R. 227; United States v. Mulligan, 2 Cir., 59 F. 2d 200.

5. State v. Gherkin, 29 N.C. 206.

The papers by which such misrepresentations were effectuated, having no intrinsic value in themselves and being non-negotiable, are not the usual subjects of counterfeiting or forgery. When they are fictitious only in the sense that they contain an implicit or explicit representation that a valid, collectible, but uncollected, receivable exists, it is very doubtful, whatever writing appeared upon them, they could be held to be the subject of counterfeiting or forgery so long as the writing did not misrepresent their origin. From the point of view of the Bank, a duplicate invoice would be equally false, though the original was properly issued in connection with a real transaction, if, at the time the duplicate was deposited with the Bank, the lumber company had already received payment or if the lumber company knew that the customer had some effective offsetting claim or credit, but such falsity would hardly lead to a contention that the duplicate invoice was counterfeited. The deposit of the duplicate invoices is simply an implicit particularization of the explicit representations contained in the loan agreement, and the implicit particularization is a falsehood unless it is true in all respects. Whether, at the time the duplicate invoice is deposited with the Bank, it be false in one respect or another, it is simply an act of misrepresentation and is not the transfer of a writing which may be said to have been "counterfeited or forged as to signature," if those words are given their usual meaning.

Finally, the Bank refers to the general rule that insurance contracts are construed against their authors. It suggests that the rule is applied more stringently in North Carolina than in South Carolina, whose laws governed our decision in the First National Bank of South Carolina case. We can perceive no difference in the application of the rule in the two states, however. As in South Carolina, it is settled in North Carolina that insurance contracts are to be construed as other contracts, and that, in the absence of ambiguity, the terms are to be given their usual and ordinary meanings, the objective being to discover and enforce the real intention of the parties.[6]

We find no distinction between this case and that which was so recently before us in First National Bank of South Carolina v. Glens Falls Ins. Co., and no reason for holding inapplicable here the conclusion we reached there.

Affirmed.

---

6. Powers v. Travelers' Insurance Company, 186 N.C. 336, 119 S.E. 481; McCain v. Hartford Live Stock Ins. Co., 190 N.C. 549, 130 S.E. 186; Bailey v. Life Ins. Co. of Virginia, 222 N.C. 716, 24 S.E.2d 614, 166 A.L.R. 826; Ford v. New York Life Ins. Co., 222 N.C. 154, 22 S.E.2d 235; Bolich v. Provident Life & Accident Ins. Co., 205 N.C. 43, 169 S.E. 826; McDaniel, Administratrix, v. Imperial Life Insurance Company, 243 N.C. 275, 90 S.E.2d 546; Marshall v. Washington National Insurance Co., 246 N.C. 447, 98 S.E.2d 345.