**FIRST NATIONAL BANK IN ST. LOUIS,**
Plaintiff,

v.

**AMERICAN INSURANCE COMPANY,**
Defendant.

No. 67 C 89(2).

United States District Court
E. D. Missouri, E. D.

Feb. 2, 1968.

---

Wm. C. Connett, IV, and Thos. C. Walsh, St. Louis, Mo., for plaintiff.

Barnard, Timm & McDaniel, St. Louis, Mo., for defendant.

## MEMORANDUM

MEREDITH, District Judge.

This case was tried to the Court. The Court has been duly advised by the submission of exhibits, taking of testimony and briefs of the parties.

Plaintiff is a national banking corporation, with its banking house in St. Louis, Missouri. Defendant is a New Jersey corporation, licensed to do business in Missouri. This Court has jurisdiction of the parties and of the subject matter because of diversity of citizenship and the amount in controversy.

First National Bank of Gorham (hereinafter called "Gorham") is a national banking corporation, with its banking house in Gorham, Illinois. Southern Illinois Co-operative Coal Sales Company (hereinafter called "Southern") is an Illinois corporation, with its office in Marion, Illinois.

Defendant issued its Bankers Blanket Bond Standard Form No. 24, with insuring clause (E), indemnifying plaintiff up to $1,000,000 which was in full force and effect during the time of these occurrences.

In the fall of 1965, Gorham approached and inquired of plaintiff if plaintiff would be interested in accounts receivable financing required by Southern. Plaintiff expressed its interest and it was orally agreed between Gorham and

plaintiff that future loans to Southern would be made on the following basis:

Gorham would in the future receive the following papers from Southern:

1. A note executed by Southern and payable to Gorham for the face amount of the proposed loan (which was 75% of the amount of the account receivable), together with a signed carbon copy of such note.

2. Schedule of assigned accounts receivable and a signed carbon copy thereof.

3. Assignment of accounts receivable and a signed carbon copy thereof.

4. Carbon copy of invoice evidencing a sale of coal. This invoice contained the name and address of the purchaser, the place of shipment, the date of the order, the railroads by which the coal was shipped, the car numbers and weights, the kind and the total dollar amount of the sale.

5. The third sheet of a bill of lading. This showed the date of the shipment, the consignee, the destination, the car numbers and weights, and included thereon the carbon copy signature of the railroad agent issuing the original bill of lading.

Pursuant to the agreement, all of the foregoing papers were to be delivered to Gorham and at that time Gorham would credit Southern's checking account at Gorham.

Plaintiff agreed with Gorham that it would accept or reject participation in any loans made by Gorham to Southern, at plaintiff's option when the loans and papers were forwarded to it.

Gorham's loan limit was $30,000. When the amount paid out by Gorham to Southern reached Gorham's loan limit, Gorham forwarded the excess to plaintiff. This was done by preparing an original certificate of participation, which it sent to plaintiff along with (1) the signed carbon copy of the Southern note, (2) the signed carbon copy of the assignment of accounts receivable, (3) the signed carbon copy of the schedule of accounts receivable, (4) a photocopy of the invoice or invoices listed in the certificates of participation and the assignments, and (5) a photocopy of the third sheet of the bill of lading issued by the railroad which included the carbon copy signature of the railroad agent.

Gorham would retain the original note, the original assignment of accounts receivable, the original schedule of accounts receivable, the carbon copy of the invoice, and the third sheet of the bill of lading with the carbon copy signature of the railroad agent. When the documents which had been forwarded by Gorham to plaintiff were received at St. Louis, they would be checked by the plaintiff to ascertain if there was any discrepancy in the schedule of accounts, the assignment of accounts, the invoices, the bills of lading, the car numbers, the weights, the notes, the participation certificates, and that the notes represented only 75% of the total amount of the assigned accounts receivable, and upon ascertaining that all of these papers were in good order, plaintiff would deposit the same amount Gorham loaned to Southern in the account of Gorham, if it decided to participate in the loan.

During the course of these dealings, plaintiff requested that all payments by Southern be made to a cash collateral account at Gorham, and once a week a check was drawn by Gorham from the collected items in the cash collateral account and sent to the plaintiff, designating which of the particular invoices and accounts had been paid.

Plaintiff charged interest to Gorham at the rate of 7% per annum. This rate was increased to 8% during April 1966. Gorham charged Southern 7%, plus a service charge of 2½% to 3½%.

The invoices delivered by Southern to Gorham did not represent actual sales of coal. These invoices were either duplicate invoices of shipments actually made or wholly fictitious as to the purchaser. The third sheets of the bills of lading were also fictitious and what purported to be the carbon copy of the signature of a railroad agent was, in fact, signed by an officer or employee of Southern.

About once a month officers or employees of the plaintiff went to Gorham and Southern offices and checked all the records at each place. These checks indicated that the accounts of Gorham and the plaintiff's offices agreed with those of Southern's. It developed, however, that Southern was keeping a fictitious set of books. In June 1966, plaintiff discovered that some of the accounts receivable of Southern were fictitious. Plaintiff notified its bonding company, the defendant. Defendant and plaintiff conducted a joint investigation to determine what could be done to recover from Southern. On August 1, 1966, plaintiff filed a proof of loss.

The parties have stipulated that the total amount of unpaid principal as of August 1, 1966, was $814,278.38; that since that time principal payments in the amount of $27,912.56 were received during August 1966, making a total unpaid principal of $786,365.82. The parties have further stipulated that interest calculated at the rate of 7% on the unpaid principal as of August 1, 1966, amounts to an additional $11,141.78. The rate of 7% was the amount of interest charged by Gorham to Southern on the original notes.

Plaintiff has asked for judgment, including interest at the rate of 7% per annum, in accordance with the tenor of the original notes, plus attorneys' fees, and a penalty of 10% for vexatious delay.

On February 6, 1967, plaintiff received written notice from the defendant of its refusal to pay the claim.

Clause (E) of the Bankers Blanket Bond Standard Form No. 24 provides as follows:

> "*Any loss through the Insured's having, in good faith and in the course of business,* whether for its own account or for the account of others, in any representative, fiduciary, agency or any other capacity, either gratuitously or otherwise, purchased or otherwise acquired, accepted or received, or sold or delivered, or given any value, *extended any credit* or assumed any liability, *on the faith of,* or otherwise acted upon any securities, *documents or other written instruments which prove to have been counterfeited or forged as to the signature of any maker,* drawer, *issuer,* endorser, assignor, lessee, transfer agent or registrar, acceptor, surety or guarantor or as to the signature of any person signing in any other capacity, or raised or otherwise altered or lost or stolen, or through the Insured's having, in good faith and in the course of business, guaranteed in writing or witnessed any signatures, whether for valuable consideration or not and whether or not such guaranteeing or witnessing is ultra vires the Insured, upon any transfers, assignments, bills of sale, powers of attorney, guarantees, endorsements or other documents upon or in connection with any securities, obligations or other written instruments and which pass or purport to pass title to such securities, obligations or other written instruments, EXCLUDING, HOWEVER, any loss through FORGERY OR ALTERATION of, on or in any checks, drafts, acceptances, withdrawal orders or receipts for the withdrawal of funds or Property, certificates of deposit, letters of credit, warrants, money orders or orders upon public treasuries; and excluding, further, any loss specified in subdivisions (1) and (2) of Insuring Clause (D) as printed in this bond, whether or not any amount of insurance is applicable under this bond to Insuring Clause (D).
>
> "Mechanically reproduced facsimile signatures are treated the same as handwritten signatures." (Italics supplied.)

Defendant contends there is no liability for the reason that the only one who relied on the documents in question and advanced credit thereon was Gorham, and that the certificate of participation relieves Gorham of any responsibility. Defendant further points out that what was really relied on, if anything, by plaintiff and/or Gorham, were the invoices which had no signatures thereon, the notes of Southern which were actual-

ly signed by bona fide officers of Southern, the assignments of accounts receivable, which were actually signed by officers of Southern, and that no one, not even Gorham, let alone the plaintiff, could rely on the photostatic copy of the third sheet of the bill of lading.

The back of the third sheet of the Uniform Domestic Straight Bill of Lading contains a number of contract terms and conditions which are identical to those on the back of the original sheet of the bill of lading. These bills of lading are non-negotiable. The third sheet of the bill of lading contains this statement:

"THIS MEMORANDUM is an acknowledgement that a Bill of Lading has been issued, and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record."

Both the third sheet and the original bill of lading contain the following statements:

"Received, subject to the classifications and tariffs in effect on the date of the receipt by the carrier of the property described in the Original Bill of Lading, the property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as indicated below, which said company (the word company being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its own road or its own water line, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed, as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns."

Correspondent banking and participation loans are well established in the banking business. Plaintiff takes the position that Gorham was either an agent of the plaintiff to obtain these loans or a co-venturer in obtaining these loans. This Court is of the opinion that this is immaterial and does not pass on the status of the relationship between Gorham and plaintiff.

The facts clearly indicate that plaintiff extended credit upon a written instrument (a photocopy of the third sheet of the bill of lading), which proved to have been forged as to the signature of the maker or issuer (the railroad agent). The fact that the document received by plaintiff was a photocopy of a carbon copy signature is immaterial to this determination. The third sheet of the bill of lading, if genuine, proved to the plaintiff bank that the original bill of lading had been issued and that the railroad had received the coal and it was being shipped to the persons reflected in the original bill of lading and corresponded with the accounts receivable which were assigned.

Plaintiff was not bound to extend credit or accept any of the participation loans made by Gorham. The decision to extend credit on each separate loan was made by plaintiff only after receiving all of the documents and making a thorough examination of them. Plaintiff relied on the forged document, the photocopy of the third sheet of the bill of lading, in extending the credit. The parties both agreed that the bond in question was issued in the State of Missouri, and that the interpretation of these transactions and the bond would be governed by the law of Missouri. The Missouri statute defining forgery is set out in V.A.M.S. § 561.011, and provides as follows:

"1. It shall be unlawful:

(1) For any person with the intent to defraud to make or alter any writing of any kind having legal ef-

ficacy or commonly relied upon in business or commercial transactions, so that it purports to have been made by another, or at another time, or with different terms, or by authority of one who did not give such authority, or for any person with intent to defraud to totally erase, obliterate or destroy any such instrument; * * * "

Missouri adopted the Uniform Commercial Code in 1963 and it became effective July 1, 1965. The defendant contends that the third sheet of the bill of lading is not such a security, document, or other instrument upon which plaintiff is entitled to rely. The Uniform Commercial Code, V.A.M.S. § 400.1–201(15), states:

" 'Document of title' includes bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers. To be a document of title a document must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass."

Section 400.7–104, V.A.M.S., defines a nonnegotiable bill of lading. Sections 400.7–301–309, V.A.M.S., define the duties of the parties with relation to bills of lading.

■ While the third sheet of a bill of lading is not an original bill of lading, it clearly states that a bill of lading has been issued. In the regular course of business dometic bills of lading are usually issued in three or four copies and the original copy is the only actual bill of lading. But the third copy is such a document on which banks are entitled to rely when signed by the railroad agent.

The Missouri courts have not passed squarely on a set of facts similar to the instant case. The leading Missouri case, which arose from this Court and was af-firmed by the Court of Appeals, is State Bank of Poplar Bluff v. Maryland Casualty Co., 289 F.2d 544 (1961), and is readily distinguishable on the facts from the instant case. That case held that the bank was not entitled to recover under Clause (D) or (E) of a Bankers Blanket Bond Standard Form 24 where the bank financed floor plan arrangements on genuine notes and chattel mortgages on nonexistent automobiles. In that case there was no forgery as to the signature on any document.

West St. Louis Trust Co. v. American Surety Co. of New York, 5 S.W.2d 669 (St.L.Ct.App.1928), construed forgery in relation to a different type of policy. This policy provided coverage against any direct loss which may be sustained through the payment by the insured bank of any check or draft drawn upon the insured bank "or of any promissory note or domestic trade acceptance or bank acceptance *payable at the Insured Bank*, and upon which there shall have been forged as the drawer, maker or acceptor thereof, the signature of a depositor or that of any person whose signature such depositor has instructed the Insured Bank to recognize." (Emphasis supplied.) The facts in that case were that the bank accepted a bona fide promissory note payable to the bank by one of its borrowers. The borrower gave as additional security two additional notes payable to the borrower along with a deed of trust securing said notes. The collateral notes were made payable at a Kentucky bank. The signatures to said notes and deed of trust given as collateral security were forged. Obviously, the facts in that case were not covered by the terms of the policy, since the collateral notes were payable in Kentucky and not at the insured bank.

In view of the scarcity of pertinent cases in the State of Missouri, the Missouri courts undoubtedly would look to the holdings of the courts of other states along with their own statutes to make a determination of this problem.

First National Bank of South Carolina v. Glens Falls Ins. Co., 304 F.2d 866 (4th

Cir. 1962), held that unsigned invoices for goods never sold or received, which were assigned to the bank by borrower as security for loans, were not within coverage of Bankers Blanket Bond insuring a bank against loss through having extended credit on faith of security or written instruments which proved to have been counterfeited or forged as to signature of maker. This case represents the majority view. The majority view requires a signature to be forged on a written document before there is coverage. The majority view would provide coverage in the instant case. A footnote in this case at page 870 collects the authorities which follow the majority view and includes State Bank of Poplar Bluff v. Maryland Casualty Co., supra.[1] It also cites the minority view, which goes even further, and provides coverage where there is no forged signature but the instrument contains fictitious or false information.[2]

■■ The cases generally agree that the meaning of the term forgery when not defined in the bond is to be determined by the meaning given in the applicable criminal statutes. Home Federal Saving & Loan Association v. Peerless Insurance Co., 197 F.Supp. 428 (N.D. Iowa 1961). This court is of the opinion based on the applicable Missouri statutes and the case law that the Missouri courts, presented with the same problem, would find this loss covered under the terms of the bond.

Judgment will be rendered for the plaintiff in the sum of $797,507.60, which includes the unpaid principal and interest at the rate of 7% up to and including August 1, 1966, and judgment for interest at the rate of 6% per annum from August 1, 1966.

■ The Court is further of the opinion that the defendant in this case, in view of the state of the law in Missouri, had the right to assert the defenses which it did. Accordingly, no award will be made to the plaintiff for vexatious delay or attorneys' fees.

---

1. Cases following the majority view are: United States Fidelity & Guaranty Co. v. First Nat. Bank of Ft. Morgan, 147 Colo. 446, 364 P.2d 202 (1961); State Bank of Poplar Bluff v. Maryland Casualty Co., supra; Torrance Nat. Bank v. Aetna Casualty & Surety Co., 251 F.2d 666 (9th Cir. 1958); Pasadena Investment Co. v. Peerless Casualty Co., 132 Cal. App.2d 328, 282 P.2d 124, 52 A.L.R.2d 203 (1955); Fitzgibbons Boiler Co. v. Employers' Liability Assurance Corp., 105 F.2d 893 (2nd Cir. 1939); North Carolina National Bank v. United States Casualty Co., 208 F.Supp. 452 (W.D. N.C.1962); United Pacific Ins. Co. v. Idaho First .National Bank, 378 F.2d 62 (9th Cir. 1967); First National Bank & Trust Co. of Oklahoma City v. United States Fidelity & Guaranty Co., 347 F. 2d 945 (10th Cir. 1965); Liberty Na-

tional Bank & Trust Co. of Louisville v. National Surety Corp., 330 F.2d 697 (6th Cir. 1964); First National Bank of Memphis v. Aetna Casualty & Surety Co., 309 F.2d 702 (6th Cir. 1962); North Carolina National Bank v. United States Casualty Co., 317 F.2d 304 (4th Cir. 1963); and see annotation, 52 A.L.R.2d 207, 215–218.

2. Cases following the minority view are: Fidelity Trust Co. v. American Surety Co. of New York, 268 F.2d 805 (3rd Cir. 1959); Security Nat. Bank of Durand v. Fidelity & Cas. Co. of New York, 246 F.2d 582 (7th Cir. 1957); Provident Trust Co. v. National Surety Corp., 138 F.2d 252 (3rd Cir. 1943); Quick Service Box Co. v. St. Paul Mercury Indemnity Co., 95 F.2d 15 (7th Cir. 1938); and see 52 A.L.R.2d 207, 210–215.