The **EXCHANGE NATIONAL BANK OF OLEAN**, Plaintiff-Appellant,

v.

**INSURANCE COMPANY OF NORTH AMERICA**, Defendant-Appellee.

**No. 184, Docket 29121.**

United States Court of Appeals
Second Circuit.

Argued Nov. 20, 1964.

Decided Feb. 19, 1965.

Robert M. Diggs, Olean, N. Y. (Hornburg, Diggs & Dwyer, Olean, N. Y., on the brief), for plaintiff-appellant.

Richard E. Moot, Buffalo, N. Y. (Ohlin, Damon, Morey, Sawyer & Moot, Buffalo, N. Y., on the brief), for defendant-appellee.

**674**

Before LUMBARD, Chief Judge, and MEDINA and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge:

Plaintiff, The Exchange National Bank of Olean, New York, commenced a diversity action in the Eastern District of Pennsylvania to recover on an indemnity bond issued by defendant, Insurance Company of North America. Defendant moved under 28 U.S.C. § 1404(a) to have the case transferred to the Western District of New York and the motion was granted. We find no error in effecting this transfer, and our primary concern is with the merits, which were resolved by the court below by granting defendant's motion for summary judgment.

There is little dispute as to the essential facts. The loss for which the Bank seeks indemnification resulted from a default on a loan to Fibre Forming Corporation, a small company in Olean, wholly owned and run by its President, C. E. Nolan. Each of the loans was evidenced by a promissory note signed by Nolan and secured by the assignment of accounts receivable. Letters from Nolan listed the accounts and stated that they had been marked assigned to the Bank. The series of loans began in 1961 and by November 1962 the Bank became concerned because of the magnitude of unpaid balances. The Bank then insisted that copies of invoices and bills of lading be submitted to attest to the genuineness of the accounts receivable. The copies of the invoices were marked, as required by the Bank, "Certified true and Correct, C. E. Nolan." This was the signature of Nolan who had placed it on the invoices himself. But, as was discovered three months later, when the Bank notified Fibre Forming's customers to make direct payment to the Bank, many of these accounts receivable were nonexistent; the shipments shown on many of the invoices had not been completed at the time the loans were made. Bankruptcy proceedings were initiated and some of the receivables were paid to the Trustee in Bankruptcy. Of the $140,333.36 loaned, apparently almost $90,000 remained unpaid, and the Bank sought indemnification under the bond for this amount.

The bond protected the Bank against many losses, but specifically excluded from coverage

"Any loss the result of the complete or partial nonpayment of or default upon any loan made by or obtained from the Insured, whether procured in good faith, or through trick, artifice, fraud or false pretenses, except when covered by Insuring Clauses (A), (D) or (E)."

The loss suffered by the Bank resulted from defaults on loans, and the limitations on this exclusion derived from Insuring Clauses (A) and (D) are clearly inapplicable. Coverage is staked upon Insuring Clause (E).[1]

1. "Securities

"(E) Any loss through the Insured's having, in good faith and in the course of business, whether for its own account or for the account of others, in any representative, fiduciary, agency or any other capacity, either gratuitously or otherwise, purchased or otherwise acquired, accepted or received, or sold or delivered, or given any value, extended any credit or assumed any liability, on the faith of, or otherwise acted upon any securities, documents or other written instruments which prove to have been counterfeited or forged as to the signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent or registrar, acceptor, surety or guarantor or as to the signature of any person signing in any other capacity, or raised or otherwise altered or lost or stolen, or through the Insured's having, in good faith and in the course of business, guaranteed in writing or witnessed any signatures, whether for valuable consideration or not and whether or not such guaranteeing or witnessing is *ultra vires* the Insured, upon any transfers, assignments, bills of sale, powers of attorney, guarantees, endorsements or other documents upon or in connection with any securities, obligations or other written instruments and which pass or purport to pass title to such securities, obligations or other written instruments; Excluding However, any loss through Forgery or Alteration of, on or in any checks, drafts, acceptances, withdrawal orders or receipts for the with-

The Bank admits, as it must, that the signature of C. E. Nolan was not "forged" and that it cannot seek the benefit of Insuring Clause (E) on the theory that the invoices were "forged as to signature." Compare Security National Bank of Durand v. Fidelity & Cas. Co. of New York, 246 F.2d 582 (7 Cir. 1957), with Fitzgibbons Boiler Co. v. Employers' Liab. Assur. Corp., 105 F.2d 893 (2 Cir. 1939). The Bank invokes Clause (E), however, on the theory that the loss resulted from having "in good faith and in the course of business * * extended * * * credit * * * on the faith of * * * securities, documents or other written instruments which * * * have been counterfeited." The contention is that the invoices certified by C. E. Nolan are "securities, documents or other written instruments" within the meaning of Clause (E), that credit was extended "in good faith" "on the faith of" these invoices, and that the invoices showing shipments not yet completed were counterfeit. We are of the opinion that the invoices could not be considered counterfeit. Judgment below is affirmed on that ground, and there is thus no need to evaluate the other propositions relied upon by the Bank in seeking the benefit of Clause (E).

The Third Circuit in Fidelity Trust Co. v. American Sur. Co. of New York, 268 F.2d 805 (3 Cir. 1959), faced with an identical provision of a bankers' indemnity bond, held, in a diversity action in which Pennsylvania law governed, that invoices which purported to cover non-existent transactions were counterfeit, and that in such a situation Insuring Clause (E)'s limitation on the exclusion for loss due to default on loans. was applicable. This is the law of Pennsylvania, which we have carefully considered but which we do not regard as binding upon us.

■■ This diversity action was properly commenced in a district court in Pennsylvania, and then transferred under § 1404(a), upon defendant's motion, to a district court in New York. Van Dusen v. Barrack, 376 U.S. 612, 639, 84 S.Ct. 805, 821, 11 L.Ed.2d 945, 963 (1964), requires that this "change of courtrooms" not result in a change in the applicable state law; and thus the law of Pennsylvania is to be applied. However, *all* of the law of Pennsylvania is to be applied, including the rules relating to conflict of laws, Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 61 S. Ct. 1020, 85 L.Ed. 1477 (1941), and we are of the opinion that the conflict law of Pennsylvania, see generally, Griffith v. United Air Lines, Inc., 416 Pa. 1, 203 A. 2d 796 (1964), would refer us to the internal law of New York, not Pennsylvania. The bond was executed in Olean, New York; it was obtained through an agent of defendant located in Olean; the Bank is situated in Olean; and presumably most of the transactions that might give rise to losses covered by the bond would occur there. Defendant's home office is in Pennsylvania, but that is not a sufficient reason for deferring to the interpretation adopted as the law of that state. The hope of achieving uniformity in the interpretation of the controverted clause by having the interpretation of the courts of the state of the home office control, cf. Order of United Commercial Travelers of America v. Wolfe, 331 U.S. 586, 592, 67 S.Ct. 1355, 1358, 91 L.Ed. 1687, 1692 (1947), is illusory in this case, since we are dealing with a standard clause used by innumerable insurance companies, whose home offices are scattered throughout the fifty states.

■■ Although the internal law of New York rather than that of Pennsylvania governs, the law of New York is unsettled on this issue. Compare

drawal of funds or Property, certificates of deposit, letters of credit, warrants, money orders or orders upon public treasuries; and excluding, further, any loss specified in subdivisions (1) and (2) of Insuring Clause (D) as printed in this

bond, whether or not any amount of insurance is applicable under this bond to Insuring Clause (D).

"Mechanically reproduced facsimile signatures are treated the same as handwritten signatures."

Johnstown Bank v. American Sur. Co. of New York, 6 A.D.2d 4, 174 N.Y.S.2d 385 (3d Dept.), motion for leave to appeal denied, 5 N.Y.2d 705, 179 N.Y.S.2d 1026, 153 N.E.2d 796 (1958) with Prudential Capital Corp. v. Royal Indem. Co., 21 A.D.2d 664, 249 N.Y.S.2d 728 (1st Dept. 1964). We exercise the choice that a New York state court would possess, and hold that these invoices cannot be considered "counterfeit" within the meaning of Insuring Clause (E). See generally, North Carolina Nat'l Bank v. United States Cas. Co., 317 F.2d 304 (4 Cir.), cert. denied, 375 U.S. 905, 84 S.Ct. 193, 11 L.Ed.2d 144 (1963); First Nat'l Bank of South Carolina of Columbia v. Glens Falls Ins. Co., 304 F.2d 866 (4 Cir. 1962); First Nat'l Bank of Memphis v. Aetna Cas. & Sur. Co., 309 F.2d 702 (6 Cir. 1962), cert. denied, 372 U.S. 953, 83 S.Ct. 951, 9 L.Ed.2d 977 (1963); United States Fid. & Guar. Co. v. First Nat'l Bank of Ft. Morgan, 147 Colo. 446, 364 P.2d 202 (1961); First Am. State Bank v. Aetna Cas. & Sur. Co., 25 Wis.2d 190, 130 N.W.2d 824 (1964); for a similar result reached upon various theories.

■ A document or writing is counterfeit if it is an imitation, if it attempts to simulate another document or writing which is authentic. The deceptive and fraudulent quality of these invoices, however, arose, not from the effort to imitate or simulate authentic invoices, but from falsity of the implicit and explicit representations of fact, to wit, that certain goods had already been shipped to a customer. To hold that these invoices are counterfeit would obliterate elementary distinctions among the techniques of deception. These distinctions are recognized in ordinary and commercial usage and they are preserved in the bond. Not all defaulting loans obtained upon the basis of fraud and deception are covered. In fact, the bond generally excludes from coverage losses resulting from default on loans, regardless of whether the loan was procured through trick, artifice, fraud or false pretenses; the limitation on this exclusion for loans fraudulently obtained through the use of counterfeit documents

merely appears as an exception to the general exclusion. There is a difference between extending credit on the basis of pledged counterfeit stock certificates, a risk clearly within the purview of the bond, and extending credit on the basis of invoices that cover non-existent shipments and that have been submitted as evidence of previously pledged accounts receivable. The bank could verify the existence of the pledged accounts receivable by inquiring with the loan applicant's purported customer, while detecting a counterfeit security is likely to pose significantly different and more serious risks to the bank.

Affirmed.