**AMERICAN NATIONAL BANK AND TRUST COMPANY OF SOUTH PASADENA, etc., Plaintiff-Appellee,**

v.

**The FIDELITY AND CASUALTY COMPANY OF NEW YORK, etc., Defendant-Appellant.**

**No. 29030**
**Summary Calendar.***

United States Court of Appeals,
Fifth Circuit.

Aug. 18, 1970.

John W. Hamilton, James B. Thompson, James R. Lyle, St. Petersburg, Fla., for defendant-appellant.

---

* ■ Rule 18, 5th Cir., Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5th Cir., 1970, 431 F.2d 409, Part I.

Robert Bussey, Gerard J. O'Brien, H. Rex Owen, St. Petersburg, Fla., for plaintiff-appellee.

Before GEWIN, GOLDBERG and DYER, Circuit Judges.

GOLDBERG, Circuit Judge:

This diversity case involves the interpretation to be given a clause of the Standard Bankers Blanket Bond. In 1964 the plaintiff Bank, American National Bank and Trust Company of South Pasadena, loaned $41,600.00 to Harry Playford, the president of the Southern Bank of St. Petersburg. This loan was secured by stock certificate number "18" purporting to represent 2,000 shares of stock owned by Playford in the Southern Bank. In 1966 Playford defaulted, and suit was filed in Florida to recover the amount due on the loan. The Bank recovered a judgment of $44,761.00 against Playford which was not paid. The Bank then attempted to collect on its security —the certificate representing 2,000 shares of the Southern Bank. The Southern Bank and later its liquidator refused to honor plaintiff's claim to the stock because other banks also held certificates numbered "18" purporting to represent the same 2,000 shares owned by Playford in the Southern Bank.

The plaintiff Bank then brought suit against defendant, the Fidelity and Casualty Company of New York, claiming that its loss on the Playford loan was insured by defendant under the Bankers Blanket Bond issued by defendant to plaintiff. The Insurance Company refused to pay the Bank's loss, and this suit resulted. The court below held that the Bank's loss was covered under the terms of the policy, and the Insurance Company now appeals. Agreeing with the decision of the court below, we affirm.

It appears from the evidence introduced at trial that the stock certificate pledged to plaintiff as security for the loan was not the certificate number 18 originally issued to Playford representing his ownership of 2,000 shares of the Southern Bank. In fact, the certificate number 18 held by plaintiff did not even come from the official stock book of the Southern Bank. The trial court therefore found, and we think the evidence supports this finding, that the certificate held by plaintiff was a counterfeit. This certificate was not a forgery, however, because it was signed by Harry R. Playford as president and E. H. Lallance as secretary and treasurer, both officers of the Southern Bank authorized to execute corporate stock certificates.

At the time the loan was made the indemnity policy in effect between the Bank and the Insurance Company provided that the Insurance Company would indemnify the Bank for

"Any loss through the Insured's having, in good faith and in the course of business, whether for its own account or for the account of others, in any representative, fiduciary, agency or any other capacity, either gratuitously or otherwise, purchased or otherwise acquired, accepted or received, or sold or delivered, or given any value, extended any credit or assumed any liability, on the faith of, or otherwise acted upon any securities, documents or other written instruments which prove to have been counterfeit or forged as to the signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent or registrar, acceptor, surety or guarantor or as to the signature of any person signing in any other capacity, or raised or otherwise altered * * *."

The Insurance Company contends that it has no liability on its bond in the present circumstances because the loss did not occur as a result of a defective signature. The Bank claims, on the other hand, that the loss resulted from a counterfeit security and that this risk was covered by the indemnity policy.

It is immediately apparent that the crux of the problem is the meaning of the phrase "counterfeit or forged as to signatures" as it appears in the Bankers Blanket Bond. If this clause is read conjunctively then only losses arising as a result of counterfeit *signatures* are cov-

ered. On the other hand, if the clause is read disjunctively then coverage is extended to losses as a result of any type of counterfeiting whether it be by forged signatures or otherwise.

The question concerning the extent of coverage afforded by the counterfeit provision in the Bankers bond has been discussed in several previous cases with conflicting results among the circuits. In approaching this problem the Fourth Circuit has read the clause conjunctively, narrowly limiting the coverage to counterfeits which arose because of some defect in signature. In First National Bank of South Carolina v. Glens Falls Insurance Co., 4 Cir. 1962, 304 F.2d 866, the court said:

" * * * The meaning of the contract in the case at bar seems to us to be plain. Protection is afforded to the insured against loss incurred by extending credit on a written instrument that is found to have been counterfeited or forged as to signature. There is no comma after the word 'counterfeited' and no other indication that the phrase does not qualify both terms of evil import; and there is positive indication that it is the counterfeited or forged signature to the fraudulent document rather than false statements in the document or the falsity of the document in its entirety which alone gives rise to the liability of the insurer. Thus, there is reference in the bond after the words 'counterfeited or forged' to the signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent or registrar, acceptor, surety or guarantor, or as to the signature of any person signing in any other capacity. Obviously, counterfeited as well as forged written instruments may be signed and we do not think that it can fairly be said that this list of persons refers only to forgeries and not to counterfeits. * * "
304 F.2d at 869.

Accord, North Carolina National Bank v. United States Casualty Company, 4 Cir. 1963, 317 F.2d 304.

Other circuits have read the same phrase disjunctively, finding that the counterfeit provision furnished independent coverage for all types of counterfeits in addition to the coverage furnished for non-genuine signatures. United Pacific Insurance Co. v. Idaho First National Bank, 9 Cir. 1967, 378 F.2d 62; Exchange Nat. Bank of Olean v. Insurance Company of North America, 2 Cir. 1965, 341 F.2d 673.

In the *United Pacific* case the Ninth Circuit explained:

"A 'counterfeit' instrument is one that 'purports to be something that it is not.' Under the provisions of the bond in suit, a forged instrument is *ex necessitate* a 'counterfeit' instrument; but a 'counterfeit' instrument need not necessarily involve a forgery within insuring clause (E)." 378 F.2d at 69.

We think this the better rule and the rule that would be applied by the Florida courts. Our court in Maryland Casualty Company v. State Bank and Trust Company, 5 Cir. 1970, 425 F.2d 979, at 983, recently aligned itself with the Second Circuit on another issue regarding counterfeit coverage by quoting with approval the following portion of the opinion in Exchange Nat. Bank of Olean v. Insurance Company of North America, *supra*:

"A document or writing is counterfeit if it is an imitation, if it attempts to simulate another document or writing which is authentic. The deceptive and fraudulent quality of these invoices, however, arose, not from the effort to imitate or simulate authentic invoices, but from falsity of the implicit and explicit representations of fact, to wit, that certain goods had already been shipped to a customer. To hold that these invoices are counterfeit would obliterate elementary distinctions among the techniques of deception. These distinctions are recognized in ordinary and commercial usage and they are preserved in the bond. Not all defaulting loans obtained upon the basis of fraud and de-

ception are covered. In fact, the bond generally excludes from coverage losses resulting from default on loans, regardless of whether the loan was procured through trick, artifice, fraud or false pretenses; the limitation on this exclusion for loans fraudulently obtained through the use of counterfeit documents merely appears as an exception to the general exclusion. *There is a difference between extending credit on the basis of pledged counterfeit stock certificates, a risk clearly within the purview of the bond,* and extending credit on the basis of invoices that cover non-existent shipments and that have been submitted as evidence of previously pledged accounts receivable. The bank could verify the existence of the pledged accounts receivable by inquiring with the loan applicant's purported customer, while detecting a counterfeit security is likely to pose significantly different and more serious risks to the bank." 341 F.2d at 676 (emphasis added).

We now join that circuit in its implicit interpretation of the coverage afforded by the counterfeit provision of the Bankers Blanket Bond and hold that the counterfeit provision extends to and covers all losses as a result of value extended on the faith of counterfeit securities whether the counterfeit arises as a result of a non-genuine signature or in some other manner.

In the case before us it is clear that the stock certificate pledged to the American National Bank and Trust Company of South Pasadena was counterfeit even though the signatures found thereon were valid. We therefore find that under the terms of the Bankers Blanket Bond the defendant Insurance Company was obligated to indemnify the Bank for the losses occasioned by its reliance on the counterfeited stock certificate.

We have examined defendant's other points of error and find them without merit. For the above reasons the decision of the district court is

Affirmed.