**RELIANCE INSURANCE COMPANY, Plaintiff, Counter–Defendant, Appellee,**

v.

**CAPITAL BANCSHARES, INC./CAPITAL BANK, Defendant, Counter–Plaintiff, Appellant.**

**SUNBELT BANCORP/SUNBELT SAVINGS ASSOCIATION OF TEXAS, Defendant, Counter–Plaintiff, Appellant,**

v.

**INTERNATIONAL INSURANCE COMPANY, Counter–Defendant, Appellee.**

No. 88–1176.

United States Court of Appeals, Fifth Circuit.

Sept. 7, 1990.

Rehearing Denied Oct. 11, 1990.

William Michael Byrd, Jr., Patricia A. Nolan, Clarice M. Davis, Kathleen J. St. John, Akin, Gump, Strauss, Hauer & Feld, Dallas, Tex., for Capital Bancshares/Capital Bank.

Nina Cortell, Haynes and Boone, Dallas, Tex., for Sunbelt and Sunbelt Sav., FSB Dallas, Tex.

James A. Knox, Stephen L. Baskind, Robert M. Hoffman, Vial, Hamilton, Koch & Knox, Dallas, Tex., for Reliance Ins. Co. and International Ins. Co.

Before POLITZ, GARWOOD, and SMITH, Circuit Judges.

GARWOOD, Circuit Judge:

The relevant facts, procedural history and contentions of the parties are set out in our July 20, 1989 unpublished opinion herein—which follows as an appendix to this opinion—issued in connection with our certification of the controlling issues of law in this case to the Supreme Court of Texas.

By its order of June 27, 1990, which apparently became final August 13, 1990, the Texas Supreme Court declined to accept the certification.

■ We agree with the district court, *see Reliance Insurance Company v. Capital Bancshares, Inc./Capital Bank,* 685 F.Supp. 148 (N.D.Tex.1988), that none of the bogus stock certificates in question is "a Counterfeit" for purposes of paragraph (3) of insuring agreement (E), read in light of paragraph (d) of the "Definitions" section, of the blanket bonds on which suit was brought herein. We reach this conclusion because there never existed any one or more particular genuine AIG stock certificates which the bogus certificates could be said to purport to be or represent or imitate, and because the bogus certificates, by virtue of their facially apparent physical characteristics and the objective facts relating to their creation, as well as the subjective intent of their creator, do not constitute attempted or intended physical imitations or duplications of either the general form of genuine AIG stock certificates or any particular genuine AIG stock certificate. We believe this conclusion follows from our opinion in *Bank of the Southwest v. National Surety Company,* 477 F.2d 73 (5th Cir.1973), a case with entirely Texas facts, where we held that "there must be or must have been [an] original instrument that the alleged counterfeit document attempts to imitate." *Id.* at 76. That principle was recently applied by the Minnesota Supreme Court, which relied, *inter alia,* on *Bank of the Southwest,* in holding that similarly bogus stock certificates were not counterfeits within the meaning of insuring agreement (E) of a similar bankers blanket bond. *National City Bank of Minneapolis v. St. Paul Fire & Marine Insurance Company,* 447 N.W.2d 171, 178–80 (Minn.1989).[1] We have been cited to no

1. In this case, the Minnesota Supreme Court concluded by stating:
"In light of the decisions under Clause (E)'s definition of 'counterfeited' and the definition's underlying policies, we must deny respondent's indemnity claim. The Bond requires an imitation of a genuine document that is in existence. Respondent does not

even contend the fake stock certificates were duplicates of genuine Panhandle stock certificates. Indeed, the fake Panhandle stock certificates were made on a standardized, generic stock certificate form, and were not imitations of genuine original Panhandle stock certificates. Thus, we reverse the court of appeals panel and hold the fake Panhandle stock

contrary authority. As there are no Texas decisions dealing with this question, we, like the district court, apply *Bank of the Southwest,* as did the Minnesota Supreme Court under facts similar to these.

■ We further agree with the district court that coverage is not available under clauses (a) and (i) of paragraph (1) of insuring agreement (E) relating to forgery. The district court noted that the introductory clause of insuring agreement (E) requires that the loss be one "resulting directly from" the forgery specified in clauses (a) and (i) of paragraph (1), and held that the claimed loss did not directly result from the forged signatures of AIG officers on the bogus certificates because "[e]ven if the signatures had been genuine, the bogus stock certificates would not have been and the banks would still have suffered losses identical to those they now face." 685 F.Supp. at 151–52. Regardless of the correctness of this approach, which may be in some tension with the reasoning in *Richardson National Bank v. Reliance Insurance Company,* 491 F.Supp. 121, 124 (N.D. Tex.1977), *aff'd,* 619 F.2d 557 (5th Cir. 1980), we conclude that paragraph (1) of insuring agreement (E) provides no coverage here because paragraph (1) is limited to forged signatures on (or alteration, loss or theft of) "any original" of the several types of documents listed in its clauses (a) through (g)—clause (a) being "Security"— and here none of the bogus stock certificates may be considered an "original" "Security." The bogus stock certificates themselves were nothing but completely fabricated inventions lacking any actual relationship whatever to any of the matters stated on them. We observe that the requirement for an "original" in paragraph (1) of insuring agreement (E)—dealing with

forgery, alteration, loss, or theft—is *not* present in paragraph (3) (dealing with counterfeits) or paragraph (2) (guaranteed or signature witnessed for transfer, etc.). This distinction should be given effect.[2] It seems to us that the import of the distinction is that clause (1) is restricted to instruments which, apart from the forged signature or alteration (or loss or theft), are otherwise genuine, actual instruments of the kinds referenced which would have value as such.[3] The bogus stock certificates are not such instruments. Since they are not an "original" "Security," no coverage is afforded under paragraph (1) of insuring agreement (E).

Accordingly, the judgment of the district court is ˙

AFFIRMED.

## APPENDIX

### (CA–3–86–1930–H)

### (July 20, 1989)

The appeal in this diversity action turns on the proper construction, under concededly applicable Texas law, of the counterfeit and forged security provisions of insuring agreement (E) of the "standard" financial institution blanket bonds issued by appellees Reliance Insurance Company (Reliance) and International Insurance Company (International) to appellant Capital Bank (Capital), a state chartered bank located in Dallas, Texas, and by Reliance to appellant Sunbelt Bancorp, whose successor in interest is appellant Sunbelt Savings Association of Texas, a state chartered savings and loan institution located in Dallas (collectively Sunbelt). We conclude that these questions of Texas law should be certified to the Texas Supreme Court.

---

certificates were not 'counterfeited' as defined by Clause (E) of the Bankers Blanket Bond." *Id.* at 180.

We have no occasion to here consider the separately provided for coverage under insuring agreement (F) respecting "Counterfeit Currency"; that coverage is not involved in the present suit.

**2.** We note that the form of insuring agreement (E) before the court in *Richardson National Bank* made no such distinction as between the

coverage it afforded for forged instruments and that it afforded for counterfeited instruments. 491 F.Supp. at 122.

**3.** We do not address the coverage under insuring agreement (D), "FORGERY OR ALTERATION," which relates generally to other categories of instruments (such as negotiable notes) and to making payments or disbursements on the basis of forged customer instructions or directions and the like. This coverage is not involved in the present suit.

Reliance instituted this suit against Capital and Sunbelt for declaratory judgment that its bonds did not cover the respective losses suffered by Capital and Sunbelt as a result of their having taken as the sole security for later wholly defaulted loans to one Bob Coats certain concededly entirely bogus purported common stock certificates in Coats' name of an actual existing corporation with outstanding, publicly traded, common stock, American International Group, Inc. (AIG), these certificates having been fraudulently created by Coats. Sunbelt and Capital counterclaimed for recovery on the bonds, and also for asserted violations of the Texas Insurance Code and the Texas Deceptive Trade Practices Act, fraud and misrepresentation, and breach of the common-law duty of good faith and fair dealing. International was made a party.[1] After the district court ordered separate trial and discovery on the insurance contract (bond) claims and all the other claims (i.e., the fraud and related tort and statutory claims), all parties moved for summary judgment on the coverage question. The district court granted the motions of Reliance and International, holding that no coverage was afforded under insuring agreement (E), the only basis on which coverage was asserted. The principal dispute in this respect was whether the bogus AIG stock certificates were counterfeits within the meaning of the bonds. The district court held that although the stock certificates were fake and bogus, they were nevertheless not counterfeits. It also held that coverage was not afforded under the forgery provisions of insuring agreement (E) although the bogus certificates bore the falsely made, unauthorized purported signatures of the secretary and president of AIG and the falsely made, unauthorized mark purporting to be that of an officer of its stock transfer agent and registrar. The district court accordingly rendered judgment for Reliance and International and against appellants, and this appeal followed.[2]

1. Appellant Capital Bancshares, Inc. (Bancshares), the holding company, parent corporation of appellant Capital, was (in addition to Capital itself) also a named insured in the bonds and was likewise a defendant to Reliance's suit and a counter-plaintiff with Capital in the referenced counterclaim.

Since the appeal, Sunbelt Savings, FSB, Dallas, Texas (FSB), having succeeded to the claims of Sunbelt here at issue, moved to intervene as appellant (and as defendant and counter-plaintiff), and we have granted this unopposed motion.

2. The district court, concluding that the counterclaims against Reliance and International for fraud and misrepresentation, violations of the Texas Insurance Code and the Texas Deceptive Trade Practices Act, and breach of common-law duty of good faith and fair dealing were dependent on there being coverage under the bonds, dismissed these counterclaims of appellants (as well as their counterclaims for recovery on the bonds). Appellants do not claim that if the district court was correct in granting summary judgment against them on the coverage issue that it nevertheless erred by dismissing all their referenced counterclaims. Otherwise stated, appellants have not asserted on appeal that they have any viable counterclaim which does not depend on there being coverage under the bonds.

Reliance and International also claimed below that there was no coverage under the bonds because, even if the stock certificates were counterfeit or were within the forgery provisions of insuring agreement (E), nevertheless Capital and Sunbelt did not rely (or rely in good faith) on the bogus stock certificates. It was not claimed in this connection that Capital or Sunbelt, or any of their officers or employees or anyone acting for them, were actually aware (or believed) that the stock certificates were other than wholly genuine, or were aware of (or illegally benefited from) Coats' fraud (or that Capital and Sunbelt did not knowingly take physical possession of the certificates as security for their loans, when the loans were made, and because of the bogus character of the certificates were unable to realize anything on them when the loans wholly defaulted). Reliance and International did not present this contention to the district court (nor do they to this Court) as a ground for summary judgment in their favor, but rather as an alternative basis for denying the motions for summary judgment (on the coverage issue and on the counterclaims on the bonds themselves) of Capital and Sunbelt. The district court, in granting summary judgment for Reliance and International, did not in any way rely on or even address this contention. It is accordingly clear, and indeed undisputed, that the judgment for Reliance and International (including the dismissal of the counterclaims of Capital, Bancshares, and Sunbelt) cannot be affirmed on this theory.

The summary judgment evidence relevant to the dispositive issues in this appeal showed that the twelve bogus stock certificates, each for five thousand shares—six of which had been pledged to Capital as security for its loans and six to Sunbelt as security for its loans—were all virtually identical to each other, except that each certificate bore a different six-digit certificate number[3] and the Capital certificates were dated January 30, 1984, while the Sunbelt certificates were dated January 27, 1984 (the loans were made in April and May 1984 by Capital and by Sunbelt in July and October 1984; the lenders took physical possession of the certificates when the initial loans were made). The certificates were entirely preprinted, in generally the usual form of conventional stock certificates, the only nonpreprinted writing thereon being the number of shares (in words and figures), the name of the registered owner ("Bob Coats"), the day, month, and last two digits of the year of issuance, all of which was typewritten in the appropriate preprinted blanks, and the purported signatures of the issuing corporation's secretary and president and the purported mark of an officer of its transfer agent and registrar, which were handwritten in ink in the appropriate preprinted blanks.[4] Coats ordered the certificates printed from a local Dallas printer (which never had any connection with AIG). The bogus certificates purported to be for common stock, par value $2.50 per share, of "American International Group, Inc.," a Delaware corporation. AIG—"American International Group, Inc."—was in fact an existing Delaware corporation, headquartered in New York City, having some eight thousand shareholders, with 72,437,060 shares of common stock, $2.50 par value per share, outstanding, such stock being publicly trad-

ed in the over-the-counter market.[5] The bogus stock certificates also had printed on them the designation "Chase Manhattan Bank New York City Transfer Agent and Registrar," and that bank was indeed then the AIG stock transfer agent and registrar. Coats had procured this information concerning AIG from a publicly circulated report ("Standard & Poor's Corp. OTC Stock Reports"), and had used it in ordering the printing of the bogus certificates; the referenced report also correctly showed "M. R. Greenberg" as president and "M. E. Fajen" as secretary of AIG, and Coats falsely signed their names in that manner in the appropriate blanks on the bogus certificates. He did all this so that Capital and Sunbelt would believe the bogus documents were genuine AIG stock certificates.

However, Coats did not own, and had never owned, any AIG stock, he had never been listed as an AIG shareholder, no genuine AIG stock certificate had ever been issued to him or in his name, and he had never possessed any genuine AIG stock certificate. Indeed, Coats had never even *seen* any genuine AIG stock certificate, or any copy or representation thereof, as he well knew, and he knew he had no idea whatever of what a genuine AIG stock certificate actually looked like, except that he assumed it would be in the same general format, and contain the same general types of information, as most stock certificates of over-the-counter publicly traded stock.

Actually, a genuine AIG common stock certificate—in the one and only form approved by its board of directors—always differed in many facially obvious respects from Coats' bogus certificates. The genuine certificate has no yellow on it, the bogus has a wide interior yellow border on each side and its embossed seal is entirely

---

**3.** Those pledged to Capital were numbers 546,-284; 546,285; 546,287; 546,289; 546,291; and 546,293. Those pledged to Sunbelt were numbers 546,816; 546,819; 546,820; 546,821; 546,-822; and 546,824.

**4.** On four of the Capital certificates, however, the signatures were apparently made by use of carbon paper. Also, at least some of the typing

on some of the certificates was done through carbon paper.

**5.** When the loans were made, the stock traded in the approximate range of $55 to $65 per share. The loans in question were for $1,280,-000 by Capital and $900,000 by Sunbelt. Later, AIG stock traded on the New York Stock Exchange.

yellow (the genuine's is blue); the genuine certificate has at its top a prominent pictorial representation of a man and a woman sitting on either side of a globe, while the bogus has no human figures, but instead a pictorial representation of a large eagle (nothing similar being on the genuine); the style of printing and type of paper is obviously different as between the two; the genuine has across its face the words "certificate of stock" printed in nearly half-inch-high capital letters, while no such or similar legend appears on the bogus document; the transfer agent and registrar information is placed on the side of the genuine certificate but at the bottom of the bogus; the genuine certificate is twelve inches long, the bogus is eleven; and there are many other obvious differences, both in actual wording and appearance. The "signatures" of the then president and secretary on a genuine certificate used their entire first names (as opposed to only the initials thereof on the bogus) and the signatures of such officers on the genuine certificates were always preprinted facsimile signatures, as opposed to individually manually inked signatures on the bogus. Moreover, the bogus certificates each bears some positively erroneous information: each bears the printed notation "Authorized Shares 72,437,060," while actually the number of authorized AIG common shares was 100,000,000 (there were, however, 72,-437,060 such shares issued and outstanding at the time; genuine AIG certificates make no reference to the number of authorized or issued and outstanding shares); each bogus certificate bears the printed legend "CUSIP 42511678," while genuine AIG certificates bear "CUSIP 026874 107," the only CUSIP number for AIG common stock (no AIG securities of any kind had CUSIP number 42511678; that was simply a number which Coats "pulled out of the air," just as he did the certificate numbers).[6]

We believe that the summary judgment evidence clearly establishes, and it is not really disputed, that: (a) the bogus stock certificates sufficiently resembled the general type of document known as a stock certificate that, in the absence of direct comparison to a genuine AIG stock certificate, they could honestly be taken as what they purported to be—genuine validly issued certificates reflecting Coats' ownership of five thousand shares of the $2.50 per share par value fully paid and nonassessable common capital stock actually issued by the existing Delaware corporation, "American International Group, Inc."; (b) when directly compared to a genuine AIG stock certificate, the bogus certificates could readily be seen by any reasonable person, without mechanical, expert, or technical assistance or minute examination, to be so different from the genuine as to be other than a duplicate or intended duplicate thereof (wholly apart from the customarily changing items, such as the owner's name, the number of shares, and the number and date of issuance of the certificate); (c) the bogus certificates, by their objective characteristics and the objective, historical facts relating to their creation, as well as by the subjective intent of their creator Coats, purported to be, and were intended to be taken as, genuine AIG stock certificates, but were not intended as physical imitations or attempted duplicates of either the general form of genuine AIG common stock certificates or any one or more particular genuine AIG common stock certificates; and (d) there never existed any one or more particular genuine AIG stock certificates which the bogus documents could be said to purport to be or represent.

The relevant provisions of each of the bonds are identical. They provided that the underwriter, subject to the other provisions of the bond, "agrees to indemnify the Insured for," which wording is followed by the heading "Insuring Agreements" under which appear several paragraphs designated respectively by the letters "(A)," "(B)," "(C)," "(D)," "(E)," and "(F)," each preceded by a subheading. The claims in this case are solely based on insuring agree-

---

6. Corporations issuing publicly traded securities each have a unique CUSIP number, the first several digits of which designate the particular corporation, the other digits designating the class of securities.

ment (E), which carries the subheading "SECURITIES" and is as follows:

"(E) *Loss resulting directly from the Insured having, in good faith,* for its own account or for the account of others,

"(*1*) acquired, sold or delivered, or given value, *extended credit* or assumed liability, *on the faith of, or otherwise acted upon, any original*

"(*a*) *Security,*

"(b) Document of Title,

"(c) deed, mortgage or other instrument conveying title to, or creating or discharging a lien upon, real property,

"(d) Certificate of Origin or Title,

"(e) Evidence of Debt,

"(f) corporate, partnership or personal Guarantee, or

"(g) Security Agreement

"*which*

"(*i*) *bears a signature of any maker,* drawer, issuer, endorser, assignor, lessee, *transfer agent, registrar,* acceptor, surety, guarantor, *or of any person signing in any other capacity which is a Forgery,* or

"(ii) is altered, or

"(iii) is lost or stolen;

"(2) guaranteed in writing or witnessed any signature upon any transfer assignment, bill of sale, power of attorney, Guarantee, endorsement on any items listed in (a) through (g) above;

"(*3*) acquired, sold or delivered, or given value, *extended credit* or assumed liability, *on the faith of, or otherwise acted upon, any item listed in (a) through (d) above which is a Counterfeit.*

"Actual physical possession of the items listed in (a) through (g) above by the Insured, its correspondent institution or other authorized representative, is a condition precedent to the Insured's having relied on the faith of, or otherwise acted upon, such items.

"A mechanically reproduced facsimile signature is treated the same as a handwritten signature." (Emphasis added.)

The bonds also contain a "Definitions" section, providing, among other things, that "[a]s used in this bond," following which are numerous definitions in separate lettered subparagraphs, including the following:

"(d) Counterfeit means an imitation which is intended to deceive and to be taken as an original.

"....

"(h) Forgery means the signing of the name of another with intent to deceive; it does not include the signing of one's own name with or without authority, in any capacity, for any purpose.

"....

"(n) Security means an instrument which

"(1) is issued in bearer or registered form; and

"(2) is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and

"(3) is either one of a class or series or by its terms is divisible into a class or series of instruments; and

"(4) evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer."

Other provisions of the bonds having possibly contextual relevance are noted in the margin.[7]

---

**7.** The "Insuring Agreements" also include the following:

"FIDELITY

"(A) Loss resulting directly from dishonest or fraudulent acts of an Employee committed alone or in collusion with others.

"....

"ON PREMISES

"(B) (1) Loss of Property resulting directly from

"(a) robbery, burglary, misplacement, mysterious unexplainable disappearance and damage thereto or destruction thereof while the Property is lodged or deposited within offices or premises located anywhere, or

"(b) theft, false pretenses, common law or statutory larceny committed by a person

"(i) present in an office of, or on the premises of, the Insured, or

"(ii) present on the premises in which the Property is lodged or deposited.

It is admitted that genuine AIG stock certificates are securities for purposes of insuring agreement (E).

The principal question in this case, as presented below and on appeal, has always been whether the bogus stock certificates were "Counterfeit" so as to be within paragraph (3) of insuring agreement (E). The district court concluded that the bogus certificates were not counterfeits, and that accordingly paragraph (3) of insuring agreement (E) did not afford coverage. The court also concluded that coverage was not afforded by clause (i), dealing with "Forgery," of paragraph (1) of insuring agreement (E). It is in essence conceded that if the district court was in error either in concluding that the bogus stock certificates were not "Counterfeit" within the

meaning of the bond or in concluding that coverage was not afforded under forgery clause (i) of paragraph (1) of insuring agreement (E), that the judgment for Reliance and International may not be affirmed, while if the district court was correct in both conclusions, its judgment must be affirmed.

In concluding that the bogus certificates were not counterfeits, the district court stressed the fact that there never existed any one or more particular or specific genuine AIG stock certificates which the bogus documents imitated. The court observed "that to be counterfeit under a Bankers or S & L Bond, the allegedly counterfeit instrument must be an imitation of an actual existing (or previously existing) original genuine document," citing our decision in

> "....
>
> "FORGERY OR ALTERATION
> "(D) Loss resulting directly from
> "(1) Forgery or alteration of, on or in any Negotiable Instrument (except an Evidence of Debt), Acceptance, withdrawal order, receipt for the withdrawal of Property, Certificate of Deposit or Letter of Credit.
> "(2) transferring, paying or delivering any funds or Property or establishing any credit or giving any value on the faith of any written instructions or advices directed to the Insured and authorizing or acknowledging the transfer, payment, delivery or receipt of funds or Property, which instructions or advices purport to have been signed or endorsed by any customer of the Insured or by any banking institution but which instructions or advices either bear a signature which is a Forgery or have been altered without the knowledge and consent of such customer or banking institution. Telegraphic, cable or teletype instructions or advices, as aforesaid, exclusive of transmissions of electronic funds transfer systems, sent by a person other than the said customer or banking institution purporting to send such instructions or advices shall be deemed to bear a signature which is a Forgery.
> "A mechanically reproduced facsimile signature is treated the same as a handwritten signature.
> "....
> "COUNTERFEIT CURRENCY
> "(F) Loss resulting directly from the receipt by the Insured, in good faith, of any Counterfeit or altered Money of the United States of America or Canada."
> The "Definitions" section included the following:

> "(1) Negotiable Instrument means any writing
> "(1) signed by the maker or drawer; and
> "(2) containing an unconditional promise or order to pay a sum certain in Money and no other promise, order, obligation or power given by the maker or drawer; and
> "(3) is payable on demand or at a definite time; and
> "(4) is payable to order or bearer.
> "(m) Property means Money, Securities, Negotiable Instruments, Certificates of Deposit, Documents of Title, Acceptances, Evidences of Debt, Security Agreements, withdrawal orders, Certificates of Origin or Title, Letters of Credit, insurance policies, abstracts of title, deeds and mortgages on real estate, revenue and other stamps, tokens, unsold state lottery tickets, books of account and other records whether recorded in writing or electronically, gems, jewelry, precious metals in bars or ingots, and tangible items of personal property which are not hereinbefore enumerated."
> The bonds contain an "Exclusions" section providing "[t]his bond does not cover," followed by several lettered subparagraphs, among which is:
> "(e) loss resulting directly or indirectly from the complete or partial nonpayment of, or default upon, any loan or transaction in the nature of a loan or extension of credit, whether involving the Insured as a lender or as a borrower, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or Evidences of Debt, whether such loan or transaction was procured in good faith or through trick, artifice, fraud or false pretenses, except when covered under Insuring Agreements (A), (D) or (E);...."

*Bank of the Southwest v. National Surety Co.*, 477 F.2d 73 (5th Cir.1973). There, we stated, "[T]here must be or must have been [an] original instrument that the alleged counterfeit document attempts to imitate." *Id.*, 477 F.2d at 76. *Bank of the Southwest* involved a claim, under a similar insuring agreement (E), respecting a bogus "Tax Collector's Receipt for Title Application No. V–460376 ('white slip')" in the name of one Levine and describing only a 1970 Cadillac; the actual receipt No. V–460376, however, had been issued to one Rodriguez and described only a 1969 Mercury. As the district court observed, we held that "[t]hus, the 'white slip' held by plaintiff [the bank] was not an imitation of an authentic original document and was not 'counterfeit' within the coverage of Insuring Agreement E." *Id.*, 477 F.2d at 77. The district court noted that "[s]imilarly, the bogus AIG stock certificates in this case were purportedly issued to someone other than the person to whom any genuine original was issued," and hence the certificates "are not direct imitations and are not counterfeit." The district court contrasted the present situation with that in *American National Bank & Trust Co. v. Fidelity & Casualty Co.*, 431 F.2d 920 (5th Cir. 1970), where the defrauder copied one of his own genuine stock certificates and it was held that the bogus certificates were counterfeits under a somewhat similar bond. The district court also recognized

that Capital and Sunbelt sought to rely on a distinction, suggested by language in certain cases including our opinion in *Maryland Casualty Co. v. State Bank & Trust Co.*, 425 F.2d 979, 983–84 (5th Cir.), *cert. denied*, 400 U.S. 828, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970), between bogus documents which deceive principally by misrepresenting an external fact and those where the essential deception is as to genuineness of execution.[8] However, the district court was not persuaded, noting that "[n]o court ... has applied this distinction to hold a document counterfeit that did not precisely imitate an original genuine document" and that "[t]he distinction cannot survive in light of ... *Bank of the Southwest.*"

Respecting the forgery issue, the district court stated that in order to recover on this theory, the wording of insuring agreement (E) required that "the claimed loss must have resulted 'directly from the Insured having in good faith ... extended credit ... on the faith of ... any original [s]ecurity ... which bears a signature of any ... transfer agent [etc.] ... which is a Forgery.'" The court ruled that these requirements were not met, stating:

"In this case the losses suffered by Capital and Sunbelt resulted directly from Coats' fraudulent scheme, but not from the forged signatures. Even if the signatures had been genuine, the bogus stock certificates would not have been

---

**8.** In *Maryland Casualty Co.*, in the course of holding that certain genuine warehouse receipts, which were false only in that they had not been canceled as required by law when the covered goods had been removed from the warehouse, were not counterfeit within a similar insuring agreement (E), we stated that we "adopt the reasoning of the Second Circuit" in *Exchange National Bank of Olean v. Insurance Company of North America*, 341 F.2d 673 (2d Cir.), *cert. denied*, 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63 (1965), and we quoted with approval the following passage, among others, from *Exchange*, 341 F.2d at 676, *viz.:*

"'A document or writing is counterfeit if it is an imitation, if it attempts to simulate another document or writing which is authentic. The deceptive and fraudulent quality of these invoices, however, arose, not from the effort to imitate or simulate authentic invoices, but

from falsity of the implicit and explicit representations of fact, to wit, that certain goods had already been shipped to a customer. To hold that these invoices are counterfeit would obliterate elementary distinctions among the techniques of deception.... There is a difference between extending credit on the basis of pledged counterfeit stock certificates, a risk clearly within the purview of the bond, and extending credit on the basis of invoices that cover non-existent shipments and that have been submitted as evidence of previously pledged accounts receivable. The bank could verify the existence of the pledged accounts receivable by inquiring with the loan applicant's purported customer, while detecting a counterfeit security is likely to pose significantly different and more serious risks to the bank.'"

*Maryland Casualty Co.*, 425 F.2d at 983–84.

and the banks would still have suffered losses identical to those they now face. Thus, the losses are not the direct result of the banks having extended credit on the faith of securities that bore forged signatures. The losses suffered by Capital and Sunbelt are not covered by the forgery provision of Insuring Agreement (E)."

We have not found, or been cited to, any opinion of any Texas appellate court which purports to address or even discuss what is necessary to constitute a document "Counterfeit" for purposes of paragraph (3) of insuring agreement (E) or any similar or analogous provision of any insurance policy, bond, or related undertaking.[9] This is a question of Texas law which may be determinative of the present appeal, and as to which it appears to this Court that there is no controlling precedent in the decisions of the Texas Supreme Court. It further appears to us that this question of Texas law may be of considerable importance. We have accordingly determined to certify this question of Texas law to the Texas Supreme Court pursuant to the Texas Constitution, Article 5, section 3–c, and Rule 114 of the Texas Rules of Appellate Procedure, as more fully set out in the certificate accompanying this opinion.

Similarly, we have not found any significant guidance from any Texas appellate court opinion in respect to the proper resolution of the forgery coverage question under clauses (a) and (i) of paragraph (1) of insuring agreement (E). This issue of forgery coverage presents itself not only in the respect directly and expressly addressed by the district court, but also in respect to whether the bogus Coats documents can be considered to meet the requirement of insuring agreement (E)'s paragraph (1), and clauses (a) and (i) thereof, that the document bearing the forged signature be "any original (a) Security" (emphasis added). It appears to us distinctly arguable that as a matter of law none of the bogus Coats documents, whatever else they may be, is an original security.[10] The forgery coverage issue under insuring agreement (E) is also a question of Texas law which may be determinative of this appeal and as to which it appears to this Court that there is no controlling precedent in the decisions of the Texas Supreme Court. We have accordingly further determined to likewise certify this question of law to the Texas Supreme Court, conditioned on its answering the counterfeit question in a manner as to deny coverage under paragraph (3) of insuring agreement (E), all as set out in the accompanying certification order.

The Clerk of this Court is therefore directed to transmit to the Texas Supreme Court a copy of this opinion and the accompanying certification order, under the official seal of this Court, together with the original record on appeal in this cause and a copy of the appellate briefs (and other written submissions on appeal) of the parties filed in this Court.

---

9. Capital and Sunbelt have cited *Texas National Bank of Dallas v. Fidelity and Deposit Company of Maryland*, 526 S.W.2d 770 (Tex.Civ.App.—Waco 1975, no writ), but we do not read that opinion as determining, or even purporting to address (in dicta, obiter dicta, or otherwise), any of the issues in this appeal.

10. At least assuming that none is a "Counterfeit" "Security" within insuring agreement (E). If the bogus Coats documents *are* within the meaning of "Counterfeit" "Security" under insuring agreement (E), then the question of forgery coverage under insuring agreement (E) is immaterial. It is also noted in this connection that the requirement that the document be an "original" is stated only in the introductory part of paragraph (1) of insuring agreement (E) and not in any of clauses (a) through (d) of paragraph (1); it is hence at the least arguable that as a matter of law the "original" requirement is applicable to, but only to, paragraph (1) coverage, and not to paragraph (3) counterfeit coverage, which refers only to "(a) through (d) above" but not expressly to paragraph (1) itself.